**STATE OF MARYLAND, and/or Ira Johnson, Sheriff, Dorchester County**

v.

**H. Rap BROWN.**

**Crim. No. 28193.**

United States District Court
D. Maryland.

Jan. 23, 1969.

Francis B. Burch, Atty. Gen., of Maryland, Morton A. Sacks, Asst. Atty. Gen., for respondents.

William M. Kunstler, New York City, Harold Buchman, Baltimore, Md., for defendant.

KAUFMAN, District Judge.

H. Rap Brown was indicted, on August 14, 1967, by the grand jury of Dorchester County, on one count of arson, one count of the common-law crime of riot and one count of the common-law crime of inciting to riot. Those offenses are alleged to have been committed by Brown in the City of Cambridge, Dorchester County, Maryland, on or about July 24, 1967, during a period of civil disorder in that city. Subsequent to August 14, 1967, Brown was arrested in Virginia on a governor's extradition warrant. Brown's efforts to prevent extradition from Virginia to Maryland, his application for bail, his attempts to have conditions of his bail altered, and his resistance to subsequent bail revocation, are set forth in Brown v. Fogel, 387 F.2d 692 (4th Cir. 1967), and United States ex rel. Brown v. Fogel, 395 F.2d 291 (4th Cir. 1968).

Brown, after unsuccessfully seeking bail in the state courts of Virginia, was granted his release by the United States District Court for the Eastern District of Virginia, on his own recognizance,

from the detaining custody of Virginia officers under the Maryland extradition warrant, provided that he "remain in the general custody of his attorney in the Southern District of New York except for travel for appearances in courts in which criminal charges are pending against him and for necessary preparation for defending such charges." 387 F.2d at 693–694, supra. Brown was also directed to "return to the Eastern District of Virginia, as soon as he was released on bail or otherwise by the United States District Court for the Eastern District of Louisiana, for transfer to the Commonwealth of Virginia, to be held without bail pending the disposition of his various appeals and other applications in opposition to his extradition to the State of Maryland for trial on the criminal charges pending against him there." 395 F.2d at 292 supra. Brown appealed, seeking a modification of the bail order to enable him to speak throughout the United States and to journey once to England for that purpose. In the resulting appeal proceeding, the Attorney General of Virginia questioned the jurisdictional and the policy bases of the District Court's release of Brown on bail. Chief Judge Haynsworth, speaking for himself and Judge Winter, rejected that attack by Virginia's Attorney General, and also denied Brown's appeal. Judge Bryan, dissenting, stated that the grant of bail should be vacated. In the majority opinion, Chief Judge Haynsworth, commenting on "Brown's attack upon extradition," noted that among the reasons stated by Brown was "that he feared bodily harm and deprivation of constitutional rights should he be delivered to the Maryland authorities.[8]" 387 F.2d at 696. (Footnote 8, in Judge Haynsworth's opinion, reads in part:

If constitutional questions should arise during the course of a trial in Maryland, they are fully subject to review in the courts of that state and on federal habeas corpus.)

Brown's bail was revoked by the District Court for the Eastern District of Virginia following a hearing in that Court and a finding by Judge Merhige that Brown had travelled to two places in California in violation of the provisions of the Court's earlier order. Judge Merhige also summarily denied Brown's petition for habeas corpus relief, after first considering the record in a Virginia state court proceeding in which Brown had sought habeas corpus relief. Holding that the evidence supported the finding of the Court below, the Fourth Circuit affirmed the revocation of bail, and also sustained the summary denial of the application for a writ of habeas corpus. Writing for Chief Judge Haynsworth, Judge Bryan and himself, Judge Winter reviewed (395 F.2d at 295–296) the proffers of proof made by Brown in the state court plenary hearing and in argument before the Fourth Circuit.

Briefly stated [wrote Judge Winter] the proffers were that the State's Attorney of Dorchester County, Maryland, the county in whose Circuit Court relator was indicted, wore a pistol in court, that Negroes were denied fundamental rights in the City of Cambridge and in Dorchester County, Maryland, that relator was struck on the forehead by a pellet from a shotgun fired at the outbreak of civil disorder in Cambridge, Maryland, which he was charged with fomenting, that General Gelston, the Commanding General of the Maryland National Guard, exonerated relator from fomenting civil disorder in Cambridge, Maryland, that civil unrest in Cambridge, Maryland was precipitated by the act of a deputy sheriff after relator had delivered a fiery speech and that relator had been advised that he could not be represented by an out-of-state lawyer at his Maryland trial.

Assuming the proffers to be true, Judge Winter wrote (at 296):

We take cognizance of the provisions of Maryland law which would permit the Circuit Court for Dorchester County, upon application, to remove relator's trial to another area of the state. Maryland Constitution, Art. IV, § 8; 7 Annotated Code of Maryland (1965

Ed.), Art. 75, § 44. And we have no doubt that upon a minimal showing that a fair and impartial trial cannot be held, removal will be freely granted. Not only is removal a provision of Maryland law which would enable relator's trial to be held in an area of the state which does not have the tensions present in Cambridge, Maryland, and thus diminish the possibility of another outbreak of civil disorder with consequent dangers to relator and others, we can presume also that Maryland will obey the command of Article 25 of its Declaration of Rights and the command of the Eighth Amendment of the Federal Constitution, as made applicable to it by the Fourteenth Amendment, and grant bail which is not excessive. If thus enlarged, relator's exposure to the danger to which he claims he will be subjected will be further diminished.

Judge Winter also noted (at 295) that Brown's "outstandingly competent counsel," conceded during argument

> what is manifest, namely, that if he were convicted in Maryland, by proceedings which denied him due process of law, he could obtain redress of his rights from the Maryland Special Court of Appeals, or the Maryland Court of Appeals, or the Supreme Court of the United States, failing which he could attack his conviction collaterally in the United States District Court for the District of Maryland, with a right of appeal to us and a discretionary right of further review to the Supreme Court of the United States. Cf. Sweeney v. Woodall, 344 U. S. 86, 73 S.Ct. 139, 97 L.Ed. 114 (1952).

Eventually, on April 18, 1968, Brown was returned to Cambridge from Virginia and "waived arraignment and was released on bail." [1]

On November 1, 1967, certain plaintiffs whose attorneys included lead counsel who had represented Brown in the proceedings reviewed supra, instituted in this Court a proceeding under 42 U.S. C. § 1983. Brown was not named as a plaintiff in the original complaint in that proceeding. Chester et al. v. Kinnamon et al., 276 F.Supp. 717 (D.Md.1967).

This Court wrote in that opinion (at 718–719):

> The complaint alleges that six of the nine plaintiffs are residents of Cambridge, Maryland, and that two of those six are members of the Cambridge Black Action Federation suing on behalf of themselves and others similarly situated. A seventh plaintiff sues as a member of the Congress of Racial Equality for himself and others similarly situated. The eighth plaintiff is alleged to be an unincorporated association, the Cambridge Black Action Federation, described as an organization "whose purpose is to help to secure to all black citizens of Cambridge the rights guaranteed to them under the Constitution of the United States, and to end all forms of racial segregation and discrimination" in Cambridge. A ninth plaintiff is the Congress of Racial Equality, stated to be an unincorporated association, with a purpose, national in scope, substantially corresponding to the local purpose of the Cambridge Black Action Federation. Jurisdiction is alleged under the Federal Constitution and named amendments thereto, and under certain federal statutes. The amount in controversy, exclusive of interest and costs, is stated to exceed $10,000.
>
> The complaint names four defendants, respectively the Chief of Police and the Fire Chief of Cambridge, and the State's Attorney and Sheriff of Dorchester County; and alleges that said defendants have "purposely conspired together and entered into a plan or scheme of concerted and joint action" with each other and with others to subject plaintiffs and the classes they represent to deprivation of their constitutional rights. Pursuant to such

---

1. Opinion of Jude C. Burman Mace, July 17, 1968, p. 1, discussed infra.

plan or scheme, defendants are alleged to have refrained and to continue to refrain from prosecuting persons seeking to kill and injure plaintiffs and members of the classes they represent, and to have prosecuted and to continue to prosecute plaintiffs and such class members under Art. 27, Secs. 7, 12 and 123 of the Annotated Code of Maryland, as amended, and under the common-law crime of "Inciting to Riot"; otherwise to harass and deter them from exercising their constitutional rights; and, to refrain from providing plaintiffs and such class members with fire and police protection. The allegations of the complaint contain specific references to certain events, including fires and acts of violence "against the black community" in Cambridge during June and July, 1967.

The complaint alleges that the three Maryland statutes and the common-law crime of inciting to riot are "void and illegal on their face and as applied to plaintiffs herein" and violative of constitutional rights of plaintiffs and the alleged class members including, among others, rights of free speech, assembly and due process. Plaintiffs claim that defendants, by threatening the enforcement of such allegedly unconstitutional statutes and unconstitutional common-law crime, with the intent to deter plaintiffs and the members of the classes which they represent from exercising their peaceful and non-violent rights, have subjected and continue to subject plaintiffs and such class members to irreparable injury.

The parties have stipulated that the indictments in certain criminal cases instituted in the Circuit Court for Dorchester County, Maryland, are part of the record in this proceeding. Respectively, those indictments charge plaintiffs Leon Lewis and James Lee Lewis under Art. 27, Sec. 12 and for "unlawfully" making "an assault upon" a police officer; plaintiff Mrs. Gladys Fletcher and James D. Fletcher under Art. 27, Sec. 7; plaintiff Lemuel Ches-

ter, Jr. with riot and incitement to riot; and plaintiff Stuart Norman Wechsler with incitement to riot. No issue has been raised by plaintiffs with regard to the charge against Messrs. Lewis, of assaulting a police officer, or with regard to the charge of riot against Lemuel Chester, Jr. None of the plaintiffs have been indicted under Art. 27, Sec. 123.

Plaintiffs ask this Court to convene a three-judge District Court pursuant to 28 U.S.C. §§ 2281 and 2284. Plaintiffs seek from such three-judge court a declaratory judgment that the three Maryland statutes and the common-law crime of inciting to riot are unconstitutional and therefore void. They also request that such court issue interlocutory and permanent injunctions against the enforcement of the three Maryland statutes and of the common-law crime of incitement to riot, as violative "on their face" of the Federal Constitution "and/or as applied to the conduct of the plaintiffs." Injunctive relief is also sought against the defendants impeding plaintiffs and the class members they represent from exercising their constitutional rights. Also, plaintiffs ask that such three-judge court enjoin further proceedings in the Circuit Court for Dorchester County in pending cases instituted pursuant to the aforementioned indictments. [Footnotes omitted.]

This Court certified the attack on Art. 27, Sec. 123 under 28 U.S.C. §§ 2281 and 2284, in view of the alleged threats to enforce that statute and this Court's holding that those allegations raised a substantial, non-frivolous constitutional issue. 276 F.Supp. at 723, supra. For reasons stated in the opinion, this Court did not so certify the questions raised with regard to Art. 27, Secs. 7 and 12 and the common-law crime of inciting to riot, stating:

This Court, as a District Court but not as a three-judge court, will, if requested so to do, promptly hold a hearing to consider on the merits whether to grant any of the relief

prayed with regard to Art. 27, Secs. 7 and 12 and the common-law crime of inciting to riot. See Lankford v. Gelston, 364 F.2d 197 (4th Cir. 1966). In that event the possible bar of 28 U.S.C. § 2283 would seemingly be in question. See Baines v. City of Danville, 337 F. 2d 579 (4th Cir. 1966); Dilworth v. Riner, 343 F.2d 226 (5th Cir. 1965). To date, however, this Court has only been asked to hold a hearing to determine whether a three-judge court, pursuant to 28 U.S.C. § 2281, is required to consider the questions concerning these two Maryland statutes and the common-law crime of inciting to riot, and to convene a three-judge court. [Footnote omitted.] 276 F.Supp. at 722–723, supra.]

On June 14, 1968, plaintiffs' counsel was permitted to file an amended complaint in the case originally denominated as "Chester [et al.] v. Kinnamon [et al.]." The amended complaint listed H. Rap Brown as the first plaintiff and included the following:

A. *Plaintiffs*

1. Plaintiff H. RAP BROWN is a black citizen of the United States. He is the Chairman of the Student Non-violent Coordinating Committee (SNCC) and he sues on behalf of himself and all members of SNCC, similarly situated, the members of which class are too numerous to bring conveniently before the Court.

\* \* \* \* \* \*

\* \* \* Specifically, plaintiff Brown has been charged with violation of Article 27, Sec. 7, Code of Maryland, Annot. and the common law crime of "Inciting to Riot"; \* \* \*.[2]

\* \* \* \* \* \*

26. On the 24th day of July, 1967, several hundred black citizens of Cambridge peaceably and lawfully assembled on Pine Street, to hear a speech by plaintiff Brown, National Chairman of the Student Non-Violent Coordinating Committee (SNCC). Shortly after the conclusion of the speech and on the same night of July 24, 1967, shots were fired by a white sheriff's deputy at a group of black citizens as they were peaceably assembled on Elm Street in the vicinity of Pine Street in said City. The said shots struck several members of the group, including the aforesaid H. Rap Brown. The defendants or some of them and police officers under the control and direction of some of the defendants refrained from taking any steps to apprehend the said sheriff's deputy or to investigate the said shooting, or to prevent further shootings at the assembled black citizens.

On November 25, 1968, after the institution of the within proceeding in this Court, plaintiffs' action in Chester v. Kinnamon was dismissed by Order of this Court "upon motion of the defendants and with the consent of the plaintiffs, with costs to the plaintiffs."

In the within proceeding[3] Brown seeks to remove the state prosecution from the Maryland courts to this Court, pursuant to 28 U.S.C. § 1443(1). Respondent asks this Court to dismiss Brown's petition

---

2. The amended complaint failed to include reference to the count of the indictment charing common-law riot. See supra, p. 65.

3. This proceeding was commenced in this Court on July 20, 1968. On August 28, 1968, respondents filed a motion to dismiss. On September 3, 1968, Brown's attorneys requested an evidentiary hearing. On September 27, 1968, this Court, in a letter to Brown's counsel, with a copy to the Attorney General of Maryland, suggested a conference of counsel with this Court on October 7, 1968. No reply was received by this Court from Brown's counsel. On October 24, 1968, not having heard from any of counsel, this Court set a conference for November 8, 1968. Brown's counsel dropped their request for an evidentiary hearing and a non-evidentiary hearing was scheduled for November 25, 1968. That hearing was held as calendared. Because plaintiff's memorandum of law was filed on the same day and because Brown's counsel had previously undertaken to file it in advance of the hearing, counsel for the State was given until December 6, 1968 to file an additional memorandum. Brown's counsel was given the same opportunity. During the hearing, this Court

for removal and the proceedings instituted herein by Brown, and to remand the criminal case against Brown to the Circuit Court for Harford County, to which it had earlier been removed under Maryland law by an Order dated July 17, 1968 by Judge C. Burman Mace, sitting in the Circuit Court for Dorchester County. Judge Mace's action was taken over the determined opposition of Brown's counsel and at the request of the prosecution.

The removal from Dorchester to Harford County resulted from a motion for change of venue, filed by the State's Attorney for Dorchester County in the Circuit Court for that county, alleging that Brown could not receive a fair and impartial trial in Dorchester County because of the public awareness of the events leading up to the indictment, and because the tensions created by those events would seriously curtail and hamper the conduct of Brown's trial in Dorchester County. On June 21, 1968, Brown filed a response in which he stated that he could not have an impartial and nonprejudicial trial in Dorchester County but claimed that he could not have an impartial or nonprejudicial trial any place in the United States, and that therefore "a change of venue, as requested by the State, would be an empty gesture designed to give the illusion of a

fair trial." Brown's Memorandum in Opposition to State's Motion for a Change of Venue, p. 1. Brown's response opposed removal and expressed a strong preference to be tried in Dorchester County because of the presence there of his witnesses, documentary material, and a large and active black community to provide logistical assistance and moral support during his trial.

A hearing on the motion for change of venue was held on July 8, 1968 in the Circuit Court for Dorchester County before Judge Mace. The State produced four witnesses: the Chief of Police of Cambridge, the Field Force Commander of the Maryland State Police, the Mayor of Cambridge and the Dorchester County Sheriff. All four witnesses testified that, in their opinion, due to the fires and disorders of July 24 and July 25, 1967, and due to the unusual amount of publicity concerning those disorders, it would be difficult to obtain proper courtroom security and atmosphere during the trial of Brown in Cambridge. They also testified about the extraordinary security measures which were required when Brown returned to Cambridge from Virginia on April 18, 1968.

The removal from Dorchester County was sought by the prosecution under Maryland Constitution, Art. IV, Sec. 8; [4] the implementing statute, Annotated

requested the Attorney General of Maryland to furnish this Court with the complete record of the proceedings before Judge Mace on July 8, 1968. Those proceedings are discussed infra p. 70 et seq. This Court was furnished with portions of that record on several dates, the last part thereof being received by this Court on January 15, 1969.

4. Md. Constitution, Art. IV, Sec. 8 provides:

The parties to any cause may submit the same to the Court for determination without the aid of a jury, and in all suits or actions, at law issues from the Orphans Court, or from any court sitting in equity and in all cases of Presentments or indictments for offences, which are or may be punishable by death, pending in any of the courts of law in this State having jurisdiction thereof upon suggestion in writing under oath of either of the parties

to said proceedings that such party cannot have a fair and impartial trial in the court in which the same may be pending, the said court shall order and direct the record of proceedings in such suit or action, issue presentment, or indictment, to be transmitted to some other court having jurisdiction in such case for trial, but in all other cases of presentment or indictment, pending in any of the Courts of law in this State having jurisdiction thereof, in addition to the suggestion in writing of either of the parties to such presentment or indictment that such party cannot have a fair and impartial trial in the court in which the same may be pending, it shall be necessary for the party making such suggestion to make it satisfactorily appear to the Court that such suggestion is true, or that there is reasonable ground for the same. And thereupon the said court shall order and direct the record of proceedings in such

Code of Maryland (1957) Art. 75, Sec. 44;[5] and Rule 738 of the Court of Appeals of Maryland.[6] Thereunder, the right of the State as well as of the defendant to seek removal in a non-capital case, and the power of the court to order removal upon the application of the State, are both clearly set forth.

On July 17, 1968, Judge Mace ordered the trial of petitioner transferred to the Circuit Court for Harford County. In that order Judge Mace stated:

The security measures necessary for an extended trial and the condition of public awareness would create an atmosphere of excitement which could operate detrimentally to the interest and rights of the defendant, the State and the general public. Lee v. State, 161 Md. 430 [157 A. 723]. While the defendant seeks to waive any right he has to removal, the State, the moving party here, has met its burden of showing to the satisfaction of the Court that it (the State) as well as the defendant could not have a fair, orderly and impartial trial in Dorchester County.

prsentment or indictment to be transmitted to some other Court having jurisdiction in such cases for trial and such right of removal shall exist upon suggestion in cases where all the Judges of said Court may be disqualified under the provisions of this Constitution to sit in any such case and said Court to which the record of proceedings in such suit, or action, issue, presentment or indictment may be so transmitted shall hear and determine the same in like manner as if such suit or action, issue, presentment or indictment had been originally instituted therein, and the General Assembly shall make such modification of existing law as may be necessary to regulate and give force to this provision.

5. Art. 75, Sec. 44 provides:

The parties to any cause may submit the same to the court for determination without the aid of the jury; and in all suits or actions at law, issues from the orphans' court, or from any court sitting in equity, and in all cases of presentments or indictments for offenses which are or may be punishable by death pending in any of the courts of law in this State having jurisdiction thereof, upon suggestion in writing, under oath, of either of the parties to said proceedings, that such party cannot have a fair and impartial trial in the court in which the same may be pending, the said court shall order and direct the record of proceedings in such suits or action, issue, presentment or indictment, to be transmitted to some other court having jurisdiction in such case for trial; but in all other cases of presentment or indictment pending in any of the courts of law in this State having jurisdiction thereof, in addition to the suggestion in writing of either of the parties to such presentment or indictment that such party cannot have a fair and impartial trial in the courts in which the same may be pending, it shall be necessary for the party making such suggestion to make it satisfactorily appear to the court that such suggestion is true, or that there is reasonable ground for the same; and thereupon the said court shall order and direct the record of proceedings in such presentment or indictment to be transmitted to some other court having jurisdiction in such cases for trial; and such right of removal shall exist upon suggestion in cases where all the judges of said court may be disqualified, under the provisions of the Constitution, to sit in any such case; and said court to which the record of proceedings in such suit or action, issue, presentment or indictment may be so transmitted, shall hear and determine the same in like manner as if such suit or action, issue, presentment or indictment had been originally instituted therein.

6. Rule 738 provides:

a. Civil Rule Applicable.

Rule 542 (Removal) shall apply to removal in criminal proceedings, subject to sections b and c of this Rule. (Const. art. IV, § 8; art. 75, §§ 44-55.)

b. Additional Requirement.

Except where the offense is punishable by death, in addition to complying with Rule 542a 1 (Removal—Right of—Suggestion Under Oath), it shall be necessary for the party making such suggestion to make it satisfactorily appear to the court that such suggestion is true, or that there is reasonable ground for the same. Const. art. IV, § 8; art. 75, § 44-55.)

c. Further Removal.

A party may have a further removal upon compliance with section a of this Rule, and in addition, such party shall make it satisfactorily appear to the court that such suggestion is true or that there is reasonable ground for the same. (Const. art. IV, § 8; art. 75, §§ 44-55.)

In his petition herein, Brown alleges that the transfer of his trial to Harford County will prevent him "from enforcing 'in the courts of such state a right under [a] law providing for the equal civil rights of citizens of the United States * * *' pursuant to 28 U.S.C. § 1443 (1), in that, among other things, he will be denied his rights under the Sixth Amendment to the Constitution of the United States 'to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed * * *.'" (Par. 6 of Brown's petition.) The petition also states that "the transfer from Dorchester to Harford County will, among other things, force petitioner to stand trial before a jury selected from an almost lily-white county compared to Dorchester County * * * where black people form approximately 10% of the total population as contrasted to one where they amount to almost 33⅓% * * * he will also be denied his rights to a jury which fairly represents the community in which the alleged crime was supposed to have taken place, all in violation of the laws of the United States providing for equal treatment for white and black defendants insofar as juries are concerned * * * in open violation of the equal protection clause of the Fourteenth Amendment to the Constitution of the United States." (Brown's petition, pars. 7).[7]

The question for this Court is whether Brown is entitled to remove this criminal case to this Court under 28 U.S.C. § 1443 (1), which provides as follows:

§ 1443. Civil rights cases

Any of the following civil actions or criminal prosecutions, commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) Against any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof.

In Georgia v. Rachel, 384 U.S. 780 at 792, 86 S.Ct. 1783, at 1790, 16 L.Ed.2d 925 (1966), the Supreme Court construed that section as follows:

On the basis of the historical material that is available, we conclude that the phrase "any law providing for * * * equal civil rights" must be construed to mean any law providing for *specific civil rights stated in terms of racial equality*. Thus, the defendants' broad contentions under the First Amendment and the Due Process Clause of the Fourteenth Amendment cannot support a valid claim for removal under § 1443, because the guarantees of those clauses are phrased in terms of general application available to all persons or citizens, rather than in the specific language of racial equality that § 1443 demands. As the Court of Appeals for the Second Circuit has concluded, § 1443 "applies only to rights that are granted in terms of equality and not to the whole gamut of constitutional rights * * *." "When the removal statute speaks of 'any law providing for equal rights,' it refers to those laws that are couched in terms of equality, such as the historic and the recent equal rights statutes, as distinguished from laws, of which the due process clause and 42 USC § 1983 are sufficient examples, that confer equal rights in the sense, vital to our way of life, of bestowing them upon all." [Citations omitted] [Emphasis added].

7. By typographical error in the petition, two paragraphs are numbered "7." In an affidavit filed with the petition Brown's counsel furnished supplementary population figures which show that blacks comprise about 8% of the population of Harford County compared to about 29.5% of the population of Dorchester County.

In *Rachel,* defendants alleged that they were indicted in a Georgia state proceeding for criminal trespass resulting from their efforts to obtain service at privately owned Atlanta restaurants open to the general public but not to members of the Negro race, and that those arrests occurred solely in the context of racial discrimination. Mr. Justice Stewart's majority opinion, after concluding that the basic constitutional claims did not provide a basis for removal under section 1443(1), noted the further allegations made with regard to the Civil Rights Act of 1964, "a law conferring a specific right of racial equality"—a law which "guarantees to all the 'full and equal enjoyment' of the facilities of any place of public accommodation without discrimination on the ground of race"—a law which provides that "No person shall * * * punish or *attempt to punish* any person for exercising or attempting to exercise any right or privilege secured" by it. 384 U.S. at 792, 793, 86 S.Ct. at 1790, supra; 42 U.S.C. § 2000a–2. Therefore, wrote Mr. Justice Stewart, the question was whether the defendants "are denied or cannot enforce" their rights under the 1964 Act "in the Georgia state courts." 384 U.S. at 794, 86 S.Ct. at 1791, supra. After considering the legislative history of section 1443(1) and the Court's earlier decisions, particularly Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880), and Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667 (1880), Mr. Justice Stewart also wrote:

> Removal is warranted only if it can be predicted by reference to a law of general application that the defendant will be denied or cannot enforce the specified federal rights in the state courts. A state statute authorizing the denial affords an ample basis for such a prediction. [384 U.S. at 800, 86 S.Ct. at 1794, supra.]

> \* \* \* \* \* \*

The Strauder-Rives doctrine, as consistently applied in all these cases, required a removal petition to allege, not merely that rights of equality would be denied or could not be enforced, but that the denial would take place in the courts of the State. The doctrine also required that the denial be manifest in a formal expression of state law. This requirement served two ends. It ensured that removal would be available only in cases where the predicted denial appeared with relative clarity prior to trial. It also ensured that the task of prediction would not involve a detailed analysis by a federal judge of the likely disposition of particular federal claims by particular state courts. That task not only would have been difficult, but it also would have involved federal judges in the unseemly process of prejudging their brethren of the state courts. Thus, the Court in Strauder and Rives concluded that a state enactment, discriminatory on its face, so clearly authorized discrimination that it could be taken as a suitable indication that all courts in that State would disregard the federal right of equality with which the state enactment was precisely in conflict.

In Rives itself, however, the Court noted that the denial of which the removal provision speaks "is primarily *if not exclusively,* a denial * * * resulting from the Constitution or laws of the State * * *." 100 U.S., at 319, 25 L.Ed. at 670. (Emphasis supplied.) This statement was reaffirmed in Gibson v. State of Mississippi, 162 U.S. 565, 581, 16 S.Ct. 904, 40 L.Ed. 1075, 1078. The Court thereby gave some indication that removal might be justified, even in the absence of a discriminatory state enactment, if an equivalent basis could be shown for an equally firm prediction that the defendant would be "denied or cannot enforce" the specified federal rights in the state court. Such a basis for prediction exists in the present case.

In the narrow circumstances of this case, *any* proceedings in the courts of the State will constitute a denial of the rights conferred by the Civil

Rights Act of 1964 * * *. [384 U.S. at 803–804, 86 S.Ct. at 1796, supra.]

\* \* \* \* \* \*

Since the Federal District Court remanded the present case without a hearing, the defendants as yet have had no opportunity to establish that they were ordered to leave the restaurant facilities solely for racial reasons. If the Federal District Court finds that allegation true, the defendants' right to removal under § 1443 (1) will be clear. The Strauder-Rives doctrine requires no more, for the denial in the courts of the State then clearly appears without any detailed analysis of the likely behavior of any particular state court. Upon such a finding it will be apparent that the conduct of the defendants is "immunized from prosecution" in any court, and the Federal District Court must then sustain the removal and dismiss the prosecutions. [384 U.S. at 805–806, 86 S.Ct. at 1797, supra.] [Footnote omitted.]

In *Rachel,* Mr. Justice Douglas concurred, joined by the Chief Justice, Mr. Justice Brennan, and Mr. Justice Fortas, citing their dissent in City of Greenwood v. Peacock, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966), as the basis for their reservations in the language but not in the result of *Rachel.*

In *Peacock,* persons engaged in civil rights activities in Greenwood, Mississippi were prosecuted for obstructing public streets. They sought removal under section 1443(1) and (2) [8] alleging,

*inter alia,* that their prosecutions were merely applications of state and city policies of racial discrimination. However, the majority of the Supreme Court, noting that "[i]n Rachel the defendants relied on the specific provisions of a federal pre-emptive civil rights law" (384 U.S. at 826, 86 S.Ct. at 1812, supra) held:

The present case differs from Rachel in two significant respects. First, no federal law confers an absolute right on private citizens—on civil rights advocates, on Negroes, or on anybody else—to obstruct a public street, to contribute to the delinquency of a minor, to drive an automobile without a license, or to bite a policeman. Second, no federal law confers immunity from state prosecution on such charges.

To sustain removal of these prosecutions to a federal court upon the allegations of the petitions in this case would therefore mark a complete departure from the terms of the removal statute, which allow removal only when a person is "denied or cannot enforce" a specified federal right "in the courts of [the] State," and a complete departure as well from the consistent line of this Court's decisions from Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664, to Commonwealth of Kentucky v. Powers, 201 U.S. 1, 26 S.Ct. 387, 50 L.Ed. 633. Those cases all stand for at least one basic proposition: It is *not* enough to support removal under § 1443(1) to allege or show that the defendant's

---

8. 28 U.S.C. § 1443(2) provides:
 Any of the following civil actions or criminal prosecutions, commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending:

 \* \* \* \* \*

 (2) For any act under color of authority derived from any law providing for equal rights, or for refusing to do any act on the ground that it would be inconsistent with such law.

 In *Peacock,* the Supreme Court concluded, in the majority opinion of Mr. Justice Stewart:
 \* \* \* the history of § 1443(2) demonstrates convincingly that this subsection of the removal statute is available only to federal officers and to persons assisting such officers in the performance of their official duties. ·[384 U.S. at 815, 86 S.Ct. at 1805, supra] [Footnote omitted.]
The dissenting opinion indicates no disagreement with the majority's construction of section 1443(2).

federal equal civil rights have been illegally and corruptly denied by state administrative officials in advance of trial, that the charges against the defendant are false, or that the defendant is unable to obtain a fair trial in a particular state court. The motives of the officers bringing the charges may be corrupt, but that does not show that the state trial court will find the defendant guilty if he is innocent, or that in any other manner the defendant will be "denied or cannot enforce in the courts" of the State any right under a federal law providing for equal civil rights. The civil rights removal statute does not require and does not permit the judges of the federal courts to put their brethren of the state judiciary on trial. Under § 1443(1), the vindication of the defendant's federal rights is left to the state courts except in the rare situations where it can be clearly predicted by reason of the operation of a pervasive and explicit state or federal law that those rights will inevitably be denied by the very act of bringing the defendant to trial in the state court. Georgia v. Rachel, 384 U.S. 780, 86 S.Ct. 1783, 16 L.Ed.2d 925; Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664.

What we have said is not for one moment to suggest that the individual petitioners in this case have not alleged a denial of rights guaranteed to them under federal law. If, as they allege, they are being prosecuted on baseless charges solely because of their race, then there has been an outrageous denial of their federal rights, and the federal courts are far from powerless to redress the wrongs done to them. The most obvious remedy is the traditional one emphasized in the line of cases from Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667, to Commonwealth of Kentucky v. Powers, 201 U.S. 1, 26 S.Ct. 387, 50 L.Ed. 633— vindication of their federal claims on direct review by this Court, if those claims have not been vindicated by the trial or reviewing courts of the State.

That is precisely what happened in two of the cases in the Rives-Powers line of decisions, where removal under the predecessor of § 1443(1) was held to be unauthorized, but where the state court convictions were overturned because of a denial of the defendants' federal rights at their trials. That is precisely what has happened in countless cases this Court has reviewed over the years—cases like Shuttlesworth v. City of Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176, to name one at random decided in the present Term. "Cases where Negroes are prosecuted and convicted in state courts can find their way expeditiously to this Court, provided they present constitutional questions." England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 434, 84 S.Ct. 461, 475, 11 L.Ed.2d 440, 456 (Douglas, J., concurring).

But there are many other remedies available in the federal courts to redress the wrongs claimed by the individual petitioners in the extraordinary circumstances they allege in their removal petitions. If the state prosecution or trial on the charge of obstructing a public street or on any other charge would itself clearly deny their rights protected by the First Amendment, they may under some circumstances obtain an injunction in the federal court. See Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22. If they go to trial and there is a complete absence of evidence against them, their convictions will be set aside because of a denial of due process of law. Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654, 80 A.L.R.2d 1355. If at their trial they are in fact denied any federal constitutional rights, and these denials go uncorrected by other courts of the State, the remedy of federal habeas corpus is freely available to them. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837. If their federal claims at trial have been denied through an unfair or deficient

fact-finding process, that, too, can be corrected by a federal court. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770. [384 U.S. at 826–829, 86 S.Ct. at 1812–1813, supra.] [Footnotes omitted.]

Writing on behalf of himself, Chief Justice Warren and Justices Brennan and Fortas, Mr. Justice Douglas dissented in *Peacock*, stating:

A defendant "is denied" his federal right when "disorderly conduct" statutes, "breach of the peace" ordinances, and the like are used as the instrument to suppress his promotion of civil rights. We know that such laws are sometimes used as a club against civil rights workers. * * * [384 U.S. at 842, 86 S.Ct. at 1820, supra.] [Footnote omitted.]

* * * * * *

There are two ways which § 1443(1) may be read, either of which leads to the conclusion that these cases are covered by the "is denied" clause. As Judge Sobeloff said, dissenting in Baines v. City of Danville, 4 Cir., 357 F.2d 756, 778, the clause in question may be paraphrased in either of the following ways;

"Removal is permissible by:

"(i) any person who is denied [ , ] or cannot enforce [ , ] in the courts of such State a right under any law * * *.

"or

"(ii) any person who is denied [ , ] or cannot enforce in the courts of such State [ , ] a right under any law * * *."

If the latter construction is taken, a right "is denied" by state action at any time—before, as well as during, a trial. I agree with Judge Sobeloff that this reading of the provisions is more in keeping with the spirit of 1866, for the remedies given were broad and sweeping:

"If a Negro's rights were denied by the actions of such state officer, the aggrieved party was permitted to have vindication in the federal court;

either by filing an original claim or, if a prosecution had already been commenced against him, by removing the case to the federal forum." Id., at 781. [384 U.S. at 844, 86 S.Ct. at 1821, supra]

* * * * * *

In my view, § 1443(1) requires the federal court to decide whether the defendant's allegation (that the state court will not fairly enforce his equal rights) is true. If the defendant is unable to demonstrate this inability to enforce his rights, the case is remanded to the state court. But if the federal court is persuaded that the state court indeed will not make a good-faith effort to apply the paramount federal law pertaining to "equal civil rights," then the federal court must accept the removal and try the case on the merits.

Such removal under the "cannot enforce" clause would occur only in the unusual case. The courts of the States generally try conscientiously to apply the law of the land. To be sure, state court judges have on occasion taken a different view of the law than that which this Court ultimately announced. But these honest differences of opinion are not the sort of recalcitrance which the "cannot enforce" clause contemplates. What Congress feared was the exceptional situation. It realized that considerable damage could be done by even a single court which harbored such hostility toward federally protected civil rights as to render it unable to meet its responsibilities. The "cannot enforce" clause is directed to that rare case.

Execution of the legislative mandate calls for particular sensitivity on the part of federal district judges; but the delicacy of the task surely does not warrant a refusal to attempt it. I am confident that the federal district judges would exercise care and good judgment in passing on "cannot enforce" claims. A district judge could not lightly assume that the state court would shirk its responsibilities, and

should remand the case to the state court unless it appeared by clear and convincing evidence that the allegations of an inability to enforce equal civil rights were true. Cf. Amsterdam, Criminal Prosecutions Affecting Federally Guaranteed Civil Rights: Federal Removal and Habeas Corpus Jurisdiction to Abort State Court Trial, 113 U.Pa.L.Rev. 793, 854–863, 911–912 (1965). [384 U.S. at 850–852, 86 S.Ct. at 1824–1825, supra.] [Footnote omitted.]

Brown's contentions in the within case meet neither the test for removal under section 1443(1) set out by Mr. Justice Stewart in *Rachel* and in *Peacock,* nor the broader test for removal stated by Mr. Justice Douglas in his dissent in *Peacock.* This Court will assume, without deciding, that the Sixth Amendment's right to trial by jury is applicable, in the context of this case, to the State of Maryland. See Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed. 2d 491 (1968); Alford v. North Carolina, 405 F.2d 340 (4th Cir. 1968). So assuming, Brown contends that he has an absolute right to be tried by a jury in and of the county in which the alleged crime occurred. Secondly, Brown argues that the specific application to him in this case of the Maryland change of venue statute has resulted or will predictably result in a denial of equal protection under the Fourteenth Amendment because the percentage of black citizens is less in Harford County than in Dorchester County.

Even if Brown's first contention, that the Sixth Amendment guarantees him the right to a jury trial in and of Dorchester County, is correct, that contention, standing alone, does not permit the removal Brown seeks under section 1443(1) because the Sixth Amendment is not a "law providing for specific civil rights stated in terms of racial equality." Georgia v. Rachel, supra, 384 U.S. at 792, 86 S.Ct. at 1790. Indeed, there are no racial overtones per se in the denial of Brown's alleged right to be tried *in* Dorchester County.

On the other hand, there are clearly racial implications in Brown's second contention, namely, that even if he does not have an absolute right to be tried in Dorchester County, the application of the Maryland change of venue statute, in this case has denied or is certain to deny him equal protection under the Fourteenth Amendment and also of a civil right "stated in terms of racial equality." Georgia v. Rachel, supra at 792, 86 S.Ct. at 1790.

The tests for removal, as set out in *Rachel* and in the majority and dissenting opinions in *Peacock,* not only speak of the type of right asserted, *i. e.,* a racially oriented right, but also of the need, at the very least, for "clear and convincing evidence" to demonstrate "a basis for 'firm prediction' of inability to enforce" that right. (City of Greenwood v. Peacock, supra, 384 U.S. at 852, 86 S.Ct. at 1825 (dissenting opinion)). There is nothing in the Maryland Constitution, statutes or rules to indicate racial discrimination in the selection of juries. There is nothing in the record in this case to date to indicate discrimination of any kind. In connection with Brown's allegation that Negroes will be discriminated against in the selection of a jury to try *him* in a Maryland court, there is no basis for such a prediction at this time.

To begin with, defendant has a right to ask for a further change of venue. Maryland Rule 738 c. Such a further change might well cause the trial to be held in a Maryland jurisdiction with a higher percentage of Negroes in its population than Harford County and perhaps with a percentage of Negroes in its population substantially the same as in or greater than the population of Dorchester County.

Second, if it is possible and practical to select a fair and impartial jury of Dorchester County residents, Brown may have a right to be tried by a jury of Dorchester County residents even though the place of trial is outside Dorchester County. See the discussion, infra p. 82.

▇▇▇ Third, after reviewing the entire transcript of the proceeding before Judge Mace and Judge Mace's opinion, this Court finds nothing in the record which in any way or in any manner indicates that Judge Mace's selection of Harford County was racially motivated. Judge Mace's Memorandum and Order set out the reasons for the change of venue clearly and specifically. The Judge stressed the difficulty of providing for an orderly trial in Dorchester County and the possibility and even probability that the trial, if held in Dorchester County, would be prejudiced by tensions and emotions existing in that area. The record does not disclose why Judge Mace chose Harford County; though it is to be noted that Harford County is not on the Eastern Shore of Maryland and lies across the Bay from the Shore, approximately one hundred miles from Cambridge. The fact that Judge Mace did not disclose, in his Memorandum and Order granting the change of venue, his reasons for selecting Harford County, cannot be considered evidence that he acted with an improper motive. As Mr. Justice Douglas said in *Peacock* (dissenting opinion, supra at 852, 86 S.Ct. at 1825), "A district judge could not lightly assume that the state court would shirk its responsibilities * * *." The fact that the removee county has a smaller percentage of blacks than Dorchester County, in the absence of any other evidence,[9] is not sufficient to constitute "clear and convincing evidence" that Brown has been or will be denied equal protection under any civil rights law or under the Fourteenth Amendment. This is particularly true in light of Brown's right of further removal.

Brown's contention that he has an absolute right to a trial in Dorchester County rests on the following propositions:

1. The Sixth Amendment's requirements for trial by jury apply to state prosecutions.

2. The word "district" in the Sixth Amendment, when the Sixth Amendment is applied to state prosecutions, means "county."

3. Since in a state criminal trial, jurors are required, by the Sixth Amendment, to be "of" the county of the crime, the place of trial should be in that county also.

To support the second and third propositions, Brown's counsel relies on the legislative history of the Sixth Amendment and the first Federal Judiciary Act, 1 Stat. 73 (1789), since, according to petitioner's Memorandum, p. 8, the Judiciary Act was considered and passed simultaneously with the approval of the Bill of Rights. Cf. Heller, The Sixth Amendment 94 (1951).

In particular, Brown's counsel, in petitioner's Memorandum of Law and Fact, on pages 7 and 8, wrote:

> During the debates, a provision of what is now known as the Sixth Amendment, that all criminal trials shall be tried "by an impartial jury of the vicinage", was dropped because of the inclusion of this very language in the pending Judiciary Act. As Madison wrote to Pendleton, on September 23, 1789, the day before the

---

9. Counsel on both sides informed the Court prior to the hearing on November 25, 1968 that they did not desire an evidentiary hearing on the State's motion to remand this case to the state courts. However, Brown has filed in this Court Xerox copies of a recent newspaper article and a recent newspaper ad. The article reveals the negative attitudes of some real estate brokers in Harford County about open housing. The advertisement is a solicitation for members for the Ku Klux Klan in Harford County. All that those excerpts, and the record in this case of racial disturbances in Cambridge, indicate is that, unfortunately and tragically, Harford and Dorchester counties are among the many communities in the United States in which racial difficulties exist. They do not, however, show that Brown has been or will be discriminated against in the proceedings pending against him.

Judiciary Act was signed by the President:

> The Senate suppose also that the provision for "vicinage" in the Judiciary Bill will sufficiently quiet the fears which called for an Amendment on this point.

On the day of the bill's passage, both the Senate and House agreed on a twelve-amendment Bill of Rights, among which was included the present Sixth Amendment.

> Accordingly, it is abundantly clear that the framers of both the Judiciary Act of 1789 and the Bill of Rights, many of whom were one and the same, were not thinking at all in terms of restricting the word "district" in the Sixth Amendment to federal districts which had been created on the very day the Bill of Rights was approved. [Footnotes omitted.]

However, the sentence cited by Brown's counsel, italicized below by this Court, when read in context, leads this Court to the opposite conclusion. Madison wrote:

> They [the Senators considering the Bill of Rights] are equally inflexible in opposing a definition of the *locality* of Juries. The vicinage they contend is either too vague or too strict a term; too vague if depending on limits to be fixed by the pleasure of the law, too strict if limited to the county. It was proposed to insert after the word Juries, "with the accustomed requisites," leaving the definition to be construed according to the judgment of professional men. Even this could not be obtained. The truth is, that in most of the States the practice is different, and hence the irreconcileable difference of ideas on the subject. In some States, jurors are drawn from the whole body of the community, indiscriminately; in others, from large districts comprehending a number of Counties; and in a few only from a single County. *The Senate suppose,*

> *also, that the provision for vicinage in the Judiciary bill will sufficiently quiet the fears which called for an amendment on this point.* [I, Madison, Letters and Other Writings, 492, 493 (Ed. R. Worthington, 1884) (emphasis of "locality" as in text; other emphasis added)].[10]

To understand what Madison and the other framers of the Sixth Amendment intended by the word "district" and to highlight the difference between a jury *in* and a jury *of* a county, it is helpful to analyze not only the provisions of the Sixth Amendment and the Judiciary Act, but also Article III, Sec. 2, Par. 3 of the Constitution itself.

Article III, Sec. 2, Par. 3 of the Constitution sets forth provisions governing the *venue* of criminal trials:

> The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; * * *.

The Sixth Amendment says that in criminal prosecutions, "the accused shall enjoy the right to a speedy and public trial, by an impartial jury *of* the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, * * *." (Emphasis added.) The Sixth Amendment does not specifically say that the accused shall enjoy a trial by a jury *in* the state and district wherein the crime shall have been committed. Rather, it seems to limit the area from which a jury can be selected (hereinafter referred to as juror-residence).

Section 29 of the Judiciary Act of 1789 (1 Stat. 79) provided:

> That in cases punishable with death, the trial shall be had in the county where the offense was committed, or where that cannot be done without great inconvenience, twelve petit ju-

---

10. See also Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 Harv. L.Rev. 49, 129, 206 (1923).

rors at least shall be summoned from thence.

In footnote b. to section 29 in 1 United States Statutes at Large, 88 (Ed. Peters, 1845), the editors observed:

The Circuit Courts of the United States are bound to try all crimes committed within the district, which are duly presented before it; but not to try them in the county where they have been committed. The United States v. Wilson and Porter, Baldwin's C.C.R. 78.

 In 1789, when the word "district" was used in the jury provision of the Sixth Amendment, Congress had just divided the eleven states which had joined the Union into thirteen districts. Massachusetts and Virginia were each divided into two districts. Each of the other nine states comprised a separate district. One of the districts in Massachusetts was soon to become Maine; one of the districts in Virginia was soon to become Kentucky. Judiciary Act, § 2, 1 Stat. 73 (1789). The exact wording of the Sixth Amendment represented a compromise between the localist tendencies of those who wished to restrict juror-residence to the county and those

who urged a minimum of restraint on the exercise of the judicial power of the national government.[11] By the use in the Sixth Amendment of the words "district and state" and by the inclusion in that Amendment of a provision leaving the definition of district to congressional determination, the framers left to future legislators the problem of precisely defining the juror-residence requirement.[12] However, the wording of section 29 of the Judiciary Act of 1789, the Sixth Amendment, and Article III, Sec. 2, Par. 3 of the Constitution indicate that the framers were well aware of the distinction between (1) venue and (2) juror-residence. Section 29 of the first Judiciary Act, for instance, specifically established stricter venue and juror-residence requirements in federal capital cases than did Article III and the Sixth Amendment. However, it provided an exception to the venue requirement in cases of great inconvenience but no such exception to the juror-residence requirement. It seems that section 29 was the "vicinage provision" referred to in Madison's letter to Pendleton.

 It is also obvious that the words "district" and "county" were not used synonymously in the three provisions.

11. Heller, The Sixth Amendment 93 (1951).

12. Nevertheless, the fear of transportation to England for trial (the Declaration of Independence objected to "transporting us beyond seas for pretended offenses") left its indelible imprint on the framers of our Constitution, the Bill of Rights and the Judiciary Act of 1789. Thus, some limitations, such as trial outside the state in which the crime was allegedly committed, and such as trial by jurors drawn from community outside that state, were included. However, little else was settled in 1789, and since then statutory and decision-making developments have not clearly defined either venue or juror-residence. See Gut v. Minnesota, 9 Wall. (U.S.) 35, 19 L.Ed. 573 (1870); Barry v. Truax, 13 N.D. 131, 99 N.W. 769, 65 L.R.A. 762 (1904); People v. Powell, 87 Cal. 348, 25 P. 481, 11 L.R.A. 75 (1891); Blume, The Place of Trial of Criminal Cases, 43 Mich.L.Rev. 59 (1944); Connor, Trial by a Jury of the

Vicinage, 57 Univ. of Pa.L.Rev. 197 (1909). The concepts of venue and of juror-residence have often been confused and lumped together, though they have sometimes been distinguished. The term "vicinage" is also often loosely used. Technically, "vicinage" means neighborhood and "vicinage of the jury" means jury of the neighborhood, or in medieval England, jury of the county. See IV Blackstone, Commentaries *351. In medieval England the county's place in the geographical and governmental structure was of course different than in this country in 1789 and today. See I Blackstone, Commentaries *114–120; Black's Law Dictionary 421 (4th Ed., 1951).

The development of the jury of the old common law of England from a jury of neighbors and representatives of the knowledge and opinion of the community, in the direction of the impartial jury of today which finds facts only on the basis of evidence produced in court, is referred to in Plucknett, A Concise History of the Common Law, 127–128 (5th Ed., 1956).

The word "county" was used in section 29 of the first Judiciary Act. The words "State and district" were used in the Sixth Amendment. A reading of the texts of that constitutional Amendment and of that statute makes it clear that "district" was not meant to connote "county," or vice versa.

In this case the question arises as to whether any federal constitutional provision limits the right of a state court to order a change of venue of a criminal trial upon application of the State and against the desires of the defendant.

In England, the Crown had the power, under certain circumstances, to require, as contrasted with the right of the defendant to request, the court to remove a criminal trial to the King's Bench from a local court. 4 Blackstone, Commentaries *321–22. In this country, the Supreme Court has indicated that a state's right to change venue from one county within a state to another within the same state is permissible under certain conditions. Gut v. Minnesota, 9 Wall. (U.S.) 35, 19 L.Ed. 573 (1870). The power of a court to grant a defendant a change of venue to avoid local prejudices was long recognized in England, and has been often utilized by courts in this country. In Maryland, the State, by Constitution, statute and rule, has rights equivalent to those of the defendant to demand removal in capital cases and to require removal upon a proper showing of cause in non-capital cases. In Casenote, Constitutional Limitations in Change of Venue in Criminal Cases, 13 Md.L.Rev. 344, 348–49 (1953), it is stated:

> We usually think of the defendant as having a right to be tried by a jury of his peers in the locality where his crime was committed. But, just as Maryland has equally allowed the State to pray a jury trial or to appeal from a magistrate's acquittal, so it allows the State a change of venue under exactly the same circumstances. [Footnote omitted.]

Also, see Price v. Maryland, 8 Gill. 295 (1849), in which the Court of Appeals of Maryland discussed the question of removal in a criminal case upon application of the State, and indicated its position that the existence and exercise of such power was not a violation of the common-law right to trial by jury. In *Price,* the State sought removal in order to secure a fair and impartial trial. The Court of Appeals stated (at 311, 312):

> That the Court of King's Bench has rightfully exercised this power of removal as an acknowledged, if not essential part of its ordinary common-law jurisdiction, both in respect to criminal and civil cases, does not seem to have been doubted in any cases in which its exercise is reported to us, of which several may be found referred to in 1st Chitty's Criminal Laws, 201. It is there said, that "at common law, the court has power of directing the trial to take place in the next adjoining county, when justice requires it."
>
> * * * [T]he same considerations must govern, and the same result can be obtained, in regard to the State and the party. There is no canon of interpretation which can be applied to the one which will not with equal force apply to the other. * *

The constitutional limitations placed on changes of venue and juror-residence in federal criminal cases are set forth in Article III, Sec. 2, Par. 3 and in the Sixth Amendment and have been discussed supra. Rule 21(a) of the Federal Rules of Criminal Procedure provides for transfer of criminal cases, under certain conditions, from the district in which the proceeding was commenced, but the first prerequisite to any such transfer is that the defendant must move for the transfer. 2 Orfield, Criminal Procedures under the Federal Rules 870–71 (1966). In Orfield, it is also stated (at 871): "Some of the states are freer to permit the government to have a change of venue for prejudice as their

constitutions are less specific as to venue.[3]" In Maryland, as discussed supra, change of venue is specifically permitted.

3. "Rule 33 of National Conference of Commissioners on Uniform State Laws, Uniform Rules of Criminal Procedure (1952) permits the government to have a change of venue in states where there are no constitutional obstacles."

■ This Court does not believe that the concepts of due process or equal protection or any other federal constitutional provision including the Sixth Amendment prohibits removal of Brown's trial out of Cambridge by a Maryland state court on application by the state and over Brown's objection. Brown's counsel contended in the extradition proceedings that his client's safety required he not be returned from Virginia to Cambridge. Surely, the State of Maryland's prosecution officials and the Court in Dorchester County had and have a duty to take note of such allegations, particularly after the events surrounding Brown's return on April 18, 1968. Further, they both have obligations to prevent violence in Dorchester County. There would appear to be nothing in the rather uncertain federal constitutional history related above which would limit, in a federal constitutional sense, the State of Maryland from granting to a trial court, by its own state Constitution and state laws, the right, for good cause shown, to change the venue of a trial. And surely the record before Judge Mace provided reason enough for the removal he ordered.

■ Although there was testimony about community awareness, and Judge Mace mentioned probable prejudice of the jury as one of the reasons for changing the venue, the record before Judge Mace does not conclusively establish that it would be impossible to obtain a fair and impartial jury for the trial of Brown composed of residents of Dorchester County. Thus, there may well be no reason why Dorchester County cannot provide the jurors for the trial in Harford County. The position of Brown's counsel is that the twin principles of venue and juror-residence are inseparable and Siamese-like. The position of the Attorney General of Maryland is that the law of Maryland (see Article 75, Sec. 44, supra) requires the use of a Harford County jury in a Harford County court, and does not permit the use of a Dorchester County jury in that court. But, perhaps, a Maryland court could so provide if it desired and if it believed that a fair and impartial jury could be so selected; and if it did, such a state practice could hardly be held violative of Sixth Amendment principles. The contentions of Brown's counsel that Brown has a right to be tried near the scenes of the alleged crimes, so that a jury can view them easily, and in a locale where a large segment of the community will provide him investigatory and other logistical assistance and moral comfort, carry, in this Court's opinion, little weight in today's age of fast transportation. The miles and hours separating the county seats of Dorchester and Harford counties hardly present insurmountable or even highly inconvenient barriers.

It is perhaps also pertinent to observe that removal to this federal Court would not provide venue in Dorchester County unless this Court sat in that county by special arrangement. Nor would removal to this Court appear to necessitate the provision of a jury selected from and composed only of Dorchester County residents. Under the Jury Selection Act of 1968, 28 U.S.C. §§ 1861–69, and the Jury Plan adopted by this Court pursuant thereto, all juries chosen for service in this Court are selected at random on a district-wide basis. The District of Maryland is composed of the entire State of Maryland. It would appear that this Court's normal jury selection procedure could be followed in a removal case. Cf. the discussion in the majority opinion in *Peacock*, supra, 384 U.S. at 834, 86 S.Ct. at 1816, and in the dissenting opinion in *Peacock*, supra, at

853–854, 86 S.Ct. at 1825–1826. If, on the other hand, Brown would be entitled, after removal to this Court, to a trial by a jury composed entirely of Dorchester County residents, it would seem that the provision of a Dorchester County jury in the state court of a removee Maryland jurisdiction would equally satisfy Brown's rights.

This Court learned during the proceedings in United States v. Cohen, 275 F.Supp. 724 (D.C.Md.1967), aff'd sub nom, United States v. DiTommaso, 405 F.2d 385 (4th Cir., December 2, 1968), that when the 1960 census was taken, Negroes formed about 15% to 16% of the state population. There are approximately twice that percentage of blacks in Dorchester County, assuming, as this Court does, for purposes of this opinion, the accuracy of Brown's racial statistics. Thus, if a state-wide jury would be provided in this Court after removal, Brown's jury would not be chosen from a population with the same percentages of whites and blacks as make up the population of Dorchester County.

 Review and analysis of Brown's arguments demonstrate that he is not entitled to remove his trial to this Court since none of his contentions satisfy the two *Rachel-Peacock* tests for removal under section 1443(1). See discussion, supra at 77. This is true even if all of Brown's constitutional propositions concerning venue and juror-residence are deemed to be— because Brown has been indicted for offenses allegedly committed during the 1967 racial disturbances in Cambridge or because of any other reason—contentions pursuant to a "law providing for the equal civil rights of citizens." Brown is not entitled under the federal Constitution to a trial with venue in Dorchester County under the circumstances of this case. In addition, there would appear to be nothing in the federal Constitution to prevent a state from trying any criminal case anywhere within the state, with a state-wide jury or with a jury selected from residents of the jurisdiction in which the alleged offenses were committed. While there may be due process, equal protection, or other constitutional limitations on the power of a state governmental system arbitrarily to *exclude* from a jury panel residents of the jurisdiction in which the crimes have allegedly been committed, a defendant would seem to have no right to be tried by a jury which is selected from a population base which includes such residents if a fair and impartial jury cannot thereby be provided or if there are other sufficiently compelling reasons for excluding from the jury residents of that jurisdiction. If Brown desires to pursue the possible application of such constitutional limitations with regard to juror-residence, as may exist, he presumably will have every opportunity to produce factual evidence and to advance his legal arguments within the framework of the Maryland court system and thereafter within the direct and collateral review procedures of the federal courts.

 There remains Brown's application for habeas corpus relief. None of Brown's constitutional rights have been violated in connection with any proceedings to date growing out of the indictments of Brown in Dorchester County. Also, in view of Brown's rights to seek further removal, it would seem that Brown has not exhausted his state remedies. See 28 U.S.C. § 2254; Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

For the reasons stated above, it is hereby ordered that the petition for removal pursuant to 28 U.S.C. § 1443(1) and the petition for habeas corpus relief be and they are hereby denied; and that the within proceedings be and they are hereby remanded to the Circuit Court for Harford County.