[Crim. No. 15505. Second Dist., Div. Five. Dec. 10, 1969.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH J. CLARK, Defendant and Appellant.

512

## COUNSEL

Richard S. Buckley, Public Defender, Charles A. Maple and James L. McCormick, Deputy Public Defenders, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Melvin R. Segal, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

AISO, J.—Counts I and II of the information charged defendant and three others with having committed armed robberies (Pen. Code, § 211) of defendant's uncle, Paul W. Jordan, and a C. Wayne Milam, and count III charged them with having kidnaped the two robbery victims for purposes of robbery (Pen. Code, § 209). To these charges, defendant pleaded "not guilty." He then made: (1) a statutory pretrial motion under section 1538.5 of the Penal Code to suppress evidence allegedly obtained by an illegal search and seizure, and (2) a "common law" pretrial motion to suppress a confession allegedly obtained in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] (*Saidi-Tabatabai* v. *Superior Court* (1967) 253 Cal.App. 2d 257 [61 Cal.Rptr. 510]). Both motions were denied. When the case was called for trial, defendant changed his plea on count I to "guilty" of robbery in the second degree. Defendant was granted probation and counts II and III were dismissed "in the interests of justice." He appeals from the judgment (order granting probation). (Pen. Code, § 1237, subd. 1.)

Trial defense counsel's declaration filed under section 1237.5, subdivision (a), of the Penal Code states that he advised his client to plead guilty solely because of the trial court's denial of defendant's 1538.5 and common law motions to suppress evidence. The trial court's certificate of probable cause (Pen. Code, § 1237.5, subd. (b)) is directed to its rulings upon both motions.

Defendant contends here that both motions should have been granted. We have concluded that the 1538.5 motion was properly denied, but that the confession should have been suppressed because the *Miranda* warning given was inadequate as a matter of law.

## I.

Joseph O. Garner, a customs inspector of 26 years' experience, was on duty on September 14, 1967, assigned to the United States Customs House in San Luis, Arizona. San Luis is a port of entry from Mexico, located approximately 25 miles south of Yuma, Arizona, which is the county seat.

About 2 p.m. that date a 1967 Pontiac Grand Prix bearing three males and one female crossed from Mexico into the United States where Garner was checking vehicles. He directed the car to be pulled aside for inspection to ascertain the nationality of the occupants and to search the vehicle for goods subject to duty. The males were all wearing long hair and beards; their clothes were soiled and dirty; they all smelled as if they needed baths. He remembered defendant, who was riding in the back seat, by his "Abraham Lincoln" type of beard that distinguished him from the others.

The vehicle had California license plates. However, Garner's search of the car turned up no vehicle registration or any rental contract from which ownership of the car could be ascertained. He found a loaded .22 calibre pistol under the front seat on the passenger side, but did not deem it to be "contraband" since it was of United States manufacture.

He asked the occupants of the car for information concerning the registered owner, but he was unable to obtain the information. Defendant told him that the car was loaned to him by a brother-in-law. The other males generally concurred that it belonged to a relative. The girl informed Garner that she was a hitchhiker and had no knowledge of the ownership of the car. She did state that "they had entered Mexico at the port of Tijuana, Baja, California, and proceeded across Highway 2, and reentered [the United States] at San Luis." She orally identified herself as Laura Jean Soldano, but she had no identification papers.

The driver of the vehicle identified himself as Jerry Dean Ivens.[1] The two in the back deat identified themselves as Joe Gordon (*sic*) Clark (defendant) and Ernest John Landon, Jr. Defendant had no identification papers. Ivens had a temporary California driving permit and a Mobil credit card with the name "Milam"[2] on it. Landon had a Texaco credit card with the name "Milam" also on it. Ivens stated that the credit card he had belonged to a cousin of his, who had received it from the cousin's uncle.

---

[1]The name is spelled "Ivens" in the information. The transcripts spell it "Ivans" at times. Whether it be spelled one way or the other, one and the same person is intended.

[2]Milam was the victim of the robbery charged in count II.

Garner became suspicious of "[w]here they got the car and why they had a pistol under the front seat," and why two persons would each be holding credit cards bearing the same name "Milam" which matched neither "Ivens" nor "Landon." He, therefore, telephoned the Arizona Highway Patrol office at Yuma requesting a check of the license number on the car and its registration. As he had to leave for another assignment before the requested information was received back from the Highway Patrol, he informed his port director, Charles Taylor, of what had transpired and left with Taylor the credit cards, identifications of two of the occupants who had such, and his notes of the oral statements which the four persons had made to him (Garner).

Summoned by radio, Glen R. Green, a State of Arizona highway patrolman, and his partner, Ken Jacobs, came to the assistance of the border inspectors at San Luis. Green had been advised by radio that the border inspectors "had a '67 Pontiac and four subjects at the port of entry, and they could find no proof of ownership in the vehicle; also there was [*sic*] some credit cards and a .22 revolver in the car."

Upon arriving at the port of entry, Green talked to Port Director Taylor. Taylor told him that the two credit cards had been found in the glove compartment of the vehicle by customs inspector Garner,[3] and that the credit cards were made out to "C. M. Milam." Taylor also informed him of the revolver in the car.

Green then proceeded to check the vehicle and question the occupants. He noted the absence of any spare tire in the trunk (of this late model car), which had been left standing open after the customs inspection. Jerry Ivens, the driver at the time the car arrived at the port of entry, told him that the car had been given to him by a person named "Paul" in Tijuana, but that he didn't know anything about him. Ivens also removed the revolver from under the front seat and handed it to Green. The others in the car said that they were hitchhikers and that they knew nothing about the ownership of the car. None of the four was able to produce any registration for the vehicle. All four told him that they did not know to whom the credit cards belonged.

Since the vehicle had a California license plate on it, Green radioed the dispatcher in Yuma to teletype the California authorities, supplying a description of the vehicle, the license plate number, and the names given to him by the occupants of the vehicle. He then detained the four for further ascertainment of the ownership of the vehicle, telling them that they could be held for vagrancy. They were transported to the Yuma sheriff's office. Green took the female person in his car; the three male persons were taken

---

[3]Green personally knew Garner.

in a sheriff's car. While enroute to Yuma, Green learned over his radio that the car had been rented from the Budget Rent A Car, an automobile rental agency which he knew to be located in San Diego, by the use of either a lost or stolen credit card and that it was to be returned on September 15th. Consequently, upon their arrival at the sheriff's office in Yuma, Green advised the four occupants of "their rights" and informed them that they were under arrest for possession of a stolen vehicle. Upon cross-examination by defendant's trial counsel, Green acknowledged that he might have seen identification papers showing the defendant's home address to be 2922 Marion, Texarkana, Texas.

Joseph C. Cwik,[4] a special agent of the FBI working out of Yuma, interviewed defendant in the Yuma County jail on September 15 and 16, 1967. He had been briefed on what had transpired by the Arizona Highway Patrol and was conducting an investigation to ascertain if charges for interstate transportation of a stolen vehicle should be preferred against defendant. The Yuma County sheriff had also advised him of a communication from Detective Sergeant Ide of the Los Angeles Police Department that the individuals in custody were possibly involved in the robbery of a residence in Los Angeles for which charges of robbery and kidnaping might be filed. During the course of the interviews, defendant conversed with Agent Cwik concerning the robbery and kidnaping charges involved in this case.

Preliminary to his conversation with defendant on the 15th, Agent Cwik read a card to defendant, which stated: "Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in a court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. A lawyer will be provided for you now if you wish by the Federal Public Defender's Office, Phoenix, Arizona, whom you may call at 253-7907."

However, Agent Cwik told defendant that since he was not yet under federal arrest, the provisions regarding the federal public defender providing him with counsel were inapplicable.

Defendant then signed a written waiver attached to the card, which was couched in the following terms: "I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and

---

[4]Spelled "Cwig" in transcript of preliminary hearing.

answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me." Prior to defendant signing the waiver, he read it back aloud to Agent Cwik.

On the following day, September 16th, Agent Cwik asked defendant if he was willing to talk, informing him that he was under no compulsion to talk if he did not wish to do so. Defendant indicated that he was desirous of talking. Agent Cwik was out of blank forms, so he showed defendant a copy of the form he had shown to defendant the previous day and defendant's written waiver attached thereto. Agent Cwik drafted a waiver form in longhand in the same language as the printed form, which defendant read back to him aloud and later signed. Agent Cwik again told defendant that the paragraph concerning the federal public defender providing counsel was inapplicable as defendant was still not under federal arrest, but in the custody of the Arizona Highway Patrol. This time, however, instead of witnessing the defendant's signature to the written waiver himself he had a deputy sheriff sign the waiver as a witness to defendant's signature "because of the charges emanating from Los Angeles."

Neither on the 15th nor on the 16th did Agent Cwik specifically ask defendant whether he wanted a lawyer right then and there or whether defendant had money to hire a lawyer, nor did he explain who would appoint a lawyer for defendant if he wanted one. He never warned the defendant that any statement defendant might make could be used against him in a state, as distinguished from a federal, court.

Defendant testified that he did not understand that he had a right to a lawyer prior to answering any question at times of the Cwik interviews. Defendant, however, never asked for a lawyer or a public defender. Defendant did not dispute Agent Cwik's testimony that he had made all statements made to Cwik freely and voluntarily.

During these conversations, Agent Cwik asked defendant whether he knew Paul Jordan and whether defendant was related to him. Defendant indicated in the affirmative by nodding his head. Cwik then informed defendant that the Los Angeles police were interested in the robbery and he asked defendant where defendant was on September 10th, "etcetera." Defendant stated: "I don't know how my uncle knew it was me. I was five blocks away." He further made a series of incriminating statements: The robbery had been planned in Texarkana a week or two prior to its execution. He and three others, a Paul Clark (aka Landon), Jerry Ivens, and a person known only as "Gypsy," perpetrated the robbery. Defendant drove a pickup truck belonging to Ivens to his uncle's residence and let the others

out. He cruised around the neighborhood until he picked the others up as they were exiting from the house. Ivens later took over the driving and all of them drove to San Diego where they rented a Ford. They drove the Ford and Ivens' pickup back to Fontana where they left the pickup truck. Then they returned to San Diego where they abondoned the Ford and rented another automobile. Gypsy left their company in San Diego. The watches and rings obtained in the robbery were sold to various individuals on the street corners in Tijuana.

Detective Sergeant John R. Ide, assigned to the robbery detail of the Van Nuys detective bureau of the Los Angeles Police Department, went to Yuma, Arizona, on September 20, 1967, and brought the defendant back to California.

## II.

Defendant contends that his admission or confession concerning the robbery of his uncle should have been excluded as being the product of an illegal arrest which commenced with a search by the border authorities who did not have reasonable and probable cause to arrest him. █ Customs officials, however, have a broad authority to conduct searches of vehicles and persons entering the United States from a foreign country. (19 U.S.C.A., §§ 482, 1582.) They do not need probable cause to arrest to justify such searches. (*People* v. *Mitchell* (1969) 275 Cal.App.2d 355, 356 [79 Cal.Rptr. 764].) Border officials may detain and search such persons and vehicles seeking entry into the country from abroad upon mere suspicion of some violation of the customs or immigration laws. (*Alexander* v. *United States* (9th. Cir. 1966) 362 F.2d 379, 382, cert. denied, 385 U.S. 977 [17 L.Ed.2d 439, 87 S.Ct. 519]; *Cervantes* v. *United States* (9th Cir. 1959) 263 F.2d 800, 803, fn. 5; and see *Carroll* v. *United States* (1925) 267 U.S. 132, 154 [69 L.Ed. 543, 551-552, 45 S.Ct. 280, 285, 39 A.L.R. 790].) █ Here were four persons, whose attire was incompatible with the late model Pontiac Grand Prix in which they were riding, coming from Mexico. The vehicle had no indicium of ownership; the riders could give no satisfactory explanation of ownership—only that a vaguely described relative had loaned it to them. A .22 calibre revolver was under the front seat. Two persons had possession of credit cards made out to "Milam" who was not with the four persons in the car. As Customs Inspector Garner testified, he became suspicious of where the four had obtained the car and why the revolver was under the front seat. Detaining the four persons under these circumstances and handing them over for further investigation to the Arizona Highway Patrol was but a legitimate act of cooperation with local enforcement authorities. (*United States* v. *Burkeen* (6th Cir. 1965) 350 F.2d 261, 263-264, cert. denied, 382 U.S.

966 [15 L.Ed.2d 369, 86 S.Ct. 457]; *People* v. *Mitchell* (1962) 209 Cal.App.2d 312, 318-319 [26 Cal.Rptr. 89], cert. denied, 374 U.S. 845 [10 L.Ed.2d 1065, 83 S.Ct. 1902].)

When Officer Green of the Arizona Highway Patrol further interrogated the four, the driver claimed that some person known only as "Paul" had turned the car over to him in Tijuana. The others claimed they were hitchhikers having no knowledge of the ownership of the car. Furthermore, they all disclaimed knowledge of the true owner of the "Milam" credit cards which two of them were separately carrying. There was reasonable and probable cause to detain defendant and his companions until a further check of the ownership of the car could be completed, if not for a formal arrest for grand theft of an automobile. Having a valid basis for detaining the occupants, it is immaterial that the officer was in error in stating that he could hold the four on vagrancy grounds. This was not an arrest for vagrancy for the purposes of a general search. (*Klingler* v. *United States* (8th Cir. 1969) 409 F.2d 299, 305-306; *People* v. *Woods* (1966) 239 Cal.App.2d 697, 702 [49 Cal.Rptr. 266], cert. denied, 385 U.S. 950 [17 L.Ed.2d 228, 87 S.Ct. 325], overruled on other grounds, *People* v. *Doherty* (1967) 67 Cal.2d 9, 15 [59 Cal.Rptr. 857, 429 P.2d 177].) When Officer Green was apprised via radio that the car had been rented from a San Diego car rental agency by the use of a lost or stolen credit card, a solid basis for the arrest of the defendant, as well as that of his companions, for car theft or possession of a stolen vehicle was established. (*People* v. *Nebbitt* (1960) 183 Cal.App.2d 452, 459 [7 Cal.Rptr. 8].)

### III

Defendant next contends that the trial court should have suppressed the incriminating statements which he made to Agent Cwik because of the inadequacy of the purported *Miranda* warning given him by Cwik. He argues that the statement by Cwik that the provision in the warning that the federal public defender would provide him with counsel was inapplicable to him because he was not then under arrest for a federal offense, rendered the warning inadequate by *Miranda* standards. The Attorney General, citing *Klingler* v. *United States, supra,* 409 F.2d 299, 308 and *Mayzak* v. *United States* (5th Cir. 1968) 402 F.2d 152, 153, 154-155, argues that the oral addendum by Agent Cwik to defendant did not render the warning inadequate. It is true that those two cases so hold under circumstances paralleling in their major aspects the situation which confronted Agent Cwik in this case. "While we are bound by decisions of the United States Supreme Court interpreting the federal Constitution [citations] we are not bound by the decisions of lower federal courts. . . . although they are persuasive and entitled to great weight [citation]."

(*People* v. *Estrada* (1965) 234 Cal.App.2d 136, 145 [44 Cal.Rptr. 165, 11 A.L.R.3d 1307].) We must bear in mind that here Cwik admitted in his testimony that he knew the Los Angeles police had defendant and his companions under suspicion for robbery and kidnaping, for which defendant might be prosecuted. He nevertheless went ahead and discussed the robbery with defendant eliciting the statements which amount to a confession of being a co-principal in the robbery of his uncle. In this respect he was, in essence, acting as an agent for the Los Angeles police as well as for the federal government.

Futhermore, neither *Klingler* nor *Mayzak* discusses *Mathis* v. *United States* (1968) 391 U.S. 1, 4-5 [20 L.Ed.2d 381, 384-385, 88 S.Ct. 1503, 1505] wherein the United States Supreme Court ruled that a suspect held under state custody is entitled to the protection of the full panoply of the *Miranda* rules even though no federal charges had yet been preferred against him.

■ To summarize the portions of the *Miranda* opinion here applicable in the language of the opinion itself: "[T]he accused must be adequately and effectively apprised of his rights" (384 U.S. 436, 467 [16 L.Ed.2d 694, 719, 86 S.Ct. 1602, 1624]). "[A]n individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation" (384 U.S. 436, 471 [16 L.Ed.2d 694, 722, 86 S.Ct. 1602, 1626]). "[I]t is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent—the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present." (384 U.S. 436, 473 [16 L.Ed.2d 694, 723, 86 S.Ct. 1602, 1627].) "No effective waiver of the right to counsel during interrogation can be recognized unless specifically made *after the warnings we here delineate have been given.*" (Italics added.) (384 U.S. 436, 470 [16 L.Ed.2d 694, 721, 86 S.Ct. 1602, 1626].)

■ The court further explained that while an attorney need not be provided immediately, it does mean "that if police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation. If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's

Fifth Amendment privilege so long as they do not question him during that time." (384 U.S. 436, 474 [16 L.Ed.2d 694, 724, 86 S.Ct. 1602, 1628].)

The court further stated: "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." (384 U.S. 436, 475 [16 L.Ed.2d 694, 724, 86 S.Ct. 1602, 1628].)

■■ Here the warning given by Agent Cwik was at best ambiguous, whereas *Miranda* requires that it be given clearly, adequately, and effectively. "Ambiguities in the warnings must be resolved against the prosecution." (*People* v. *Stewart* (1968) 267 Cal.App.2d 366, 378 [73 Cal.Rptr. 484]; cf. *People* v. *Bolinski* (1968) 260 Cal.App.2d 705, 723 [67 Cal.Rptr. 347].) Under *Miranda* and *Mathis,* Agent Cwik should have refrained from interrogating defendant if he was not in a postion to provide counsel for him through the federal public defender's office and unable to furnish counsel from state agencies. Under the circumstances of this case, the purported waivers cannot be held to have been intelligently and knowingly made. The statements concerning defendant's participation in the robbery of his uncle, Paul W. Jordan, should have been excluded by the trial court. While the applicability of the *Miranda* rule is the same whether the statement or statements be confessions or only admissions (384 U.S. 436, 476 [16 L.Ed.2d 694, 725, 86 S.Ct. 1602, 1629]), the statements made by defendant to Agent Cwik amounted to a confession of being at least an aider and abettor of the robbery, requiring a reversal (*People* v. *Schader* (1965) 62 Cal.2d 716, 728-729 [44 Cal.Rptr. 193, 401 P.2d 665]; *People* v. *Williams* (1969) 71 Cal.2d 614, 621 [79 Cal.Rptr. 65, 456 P.2d 633].)

IV

The judgment (order granting probation) is reversed.

Kaus, P. J., and Reppy, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied February 5, 1970. Mosk, J., was of the opinion that the petition should be granted.