[Crim. No. 16563. In Bank. June 5, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
LEON DWIGHT JONES, Defendant and Appellant.

## COUNSEL

Richard S. Buckley, Public Defender, and Charles A. Gessler, Deputy Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Frederick R. Millar, Jr., and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SULLIVAN, J.**—Defendant Leon Dwight Jones was found guilty by a jury of three counts of selling marijuana (Health & Saf. Code, § 11531) and sentenced to state prison for the term prescribed by law. Defendant appeals

contending that the systematic exclusion from the jury of all residents of the district where the crime was committed violated his right under the Sixth and Fourteenth Amendments to the United States Constitution to a trial "by an impartial jury of the State and district wherein the crime shall have been committed" and thereby invalidated his conviction.

The pertinent facts, as stipulated to by the parties, are as follows: Defendant was a resident of the 77th Street Los Angeles Police Department Precinct (77th Street Precinct). All of the crimes with which he was charged occurred within that precinct. Pursuant to Los Angeles County Ordinance No. 9743, effective March 21, 1969, the 77th Street Precinct had been removed from the Southwest Superior Court District (Southwest District) and included within the Central Superior Court District (Central District) of Los Angeles County. On May 26, 1970, the presiding judge of the Los Angeles Superior Court ordered that all crimes committed in the 77th Street Precinct be tried in the Southwest District instead of the Central District "because there were not enough judges or courtrooms downtown to handle the volume of work, and it was contemplated that the 77th Street cases would be tried in the Southwest District until the new Criminal Courts Building was completed in downtown Los Angeles in the Fall of 1972."

During this period all jurors who sat on cases in the courthouse in Torrance in the Southwest District were drawn from the geographical area known as the Southwest District. Jurors who resided in the 77th Street Precinct in the Central District were not drawn for jury service in the Southwest District, but were drawn to serve exclusively in the Central District. However, the Jury Commissioner of Los Angeles County indicated that it would be possible to select and transport residents of the 77th Street Precinct to the Southwest District to serve as jurors.

The 1970 census figures show the following pertinent population statistics: the 77th Street Precinct had a population of approximately 240,000 of which 73 percent were Negro; the Southwest District had a population of approximately 700,000 of which 7 percent were Negro; the population of the Central District was 31 percent Negro; the combined population of the Southwest District and the 77th Street Precinct would be 23 percent Negro.

Pursuant to the May 26, 1970, order, defendant's case was set for trial in department "F" of the Southwest District. Defendant moved to transfer the trial to the Central District on the ground that the jurors from the area where the alleged crime (for convenience we refer to defendant's offenses in the singular) occurred were included within the Central District jury

panel, but excluded from the jury panel of the Southwest District. The motion was denied. Following an unsuccessful attempt to secure a writ of prohibition from the appellate courts, defendant made a motion challenging the jury panel on the same grounds and urging inclusion in the jury panel of a proportional number of jurors residing in the district where the alleged crime occurred. The motion was heard and denied in department "A" of the Southwest District. Defendant was then tried and convicted in department "F" of the Southwest District by a jury drawn from a panel which systematically excluded potential jurors who resided in the Central District. This appeal followed.

The Sixth Amendment to the United States Constitution provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, . . ." Invoking his right to a jury under this amendment, defendant argues that it is an essential feature of such a jury that it be drawn from the "district wherein the crime shall have been committed."

The United States Supreme Court held in *Duncan* v. *Louisiana* (1968) 391 U.S. 145, 149 [20 L.Ed.2d 491, 496, 88 S.Ct. 1444], that "the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee." (Fn. omitted.) In *Williams* v. *Florida* (1970) 399 U.S. 78 [26 L.Ed.2d 446, 90 S.Ct. 1893], the high court determined that not all "features of the jury system, as it existed at common law, were preserved in the Constitution" (*id.* at p. 99 [26 L.Ed.2d at p. 460]), but only essential features were preserved in the Sixth Amendment. The court determines those features which are indispensable components of a jury under the Sixth Amendment by examining the "function that the particular feature performs and its relation to the purposes of the jury trial." (*Id.* at pp. 99-100 [26 L.Ed.2d at p. 460].)

More recently in *Peters* v. *Kiff* (1972) 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163], the Supreme Court said: "In *Williams* v. *Florida,* 399 U.S. 78 (1970), we sought to delineate some of the essential features of the jury that is guaranteed, in certain circumstances, by the Sixth Amendment. We concluded that it comprehends, *inter alia,* 'a fair possibility for obtaining a representative cross-section of the community.' 399 U.S., at 100." (*Id.* at p. 500, fn. omitted [33 L.Ed.2d at p. 92].) The court took pains to explain the significance of a representative jury: "The principle of the representative jury was first articulated by this Court as a requirement of equal protection, in cases vindicating the right of a Negro defend-

ant to challenge the systematic exclusion of Negroes from his grand and petit juries. E.g., *Smith* v. *Texas,* 311 U.S. 130 (1940). Subsequently, in the exercise of its supervisory power over federal courts, this Court extended the principle, to permit any defendant to challenge the arbitrary exclusion from jury service of his own or any other class. E.g., *Glasser* v. *United States,* 315 U.S. 60, 83-87 (1942); *Thiel* v. *Southern Pacific Co.,* 328 U.S. 217, 220 (1946); *Ballard* v. *United States,* 329 U.S. 187 (1946). Finally it emerged as an aspect of the constitutional right to jury trial in *Williams* v. *Florida,* 399 U.S. 78, 100 (1970)." (407 U.S. at p. 500, fn. 9 [33 L.Ed.2d at p. 92].)

In *Williams* the Supreme Court detailed the legislative history behind the passage of the Sixth Amendment and emphasized that the common law right to be tried by a "jury of the vicinage," unlike the common law right to a jury of 12 members, was an essential feature of jury trial, which was explicitly preserved, though redefined, by the Sixth Amendment. It observed: "Indeed, pending and after the adoption of the Constitution, fears were expressed that Article III's provision failed to preserve the common-law right to be tried by a 'jury of the vicinage.'[1] [Fn. omitted.] That concern, as well as the concern to preserve the right to jury in civil as well as criminal cases, furnished part of the impetus for introducing amendments to the Constitution that ultimately resulted in the jury trial provisions of the Sixth and Seventh Amendments. As introduced by James Madison in the House, the Amendment relating to jury trial in criminal cases would have provided that: 'The trial of all crimes . . . shall be by an impartial jury of freeholders of the vicinage, with the requisite of unanimity for conviction, of the right of challenge, and other accustomed requisites . . . .' [Fn. omitted.] The Amendment passed the House in substantially this form, but after more than a week of debate in the Senate it returned to the House considerably altered. [Fn. omitted.] . . . As reported in a second letter by Madison on September 23, 1789, the Senate remained opposed to the vicinage requirement, partly because in its view the then-impending judiciary bill—which was debated at the same time as the Amendments— adequately preserved the common-law vicinage feature, making it unnecessary to freeze that requirement into the Constitution. 'The Senate,' wrote

---

[1]The court explained: "Technically, 'vicinage' means neighborhood, and 'vicinage of the jury' meant jury of the neighborhood or, in medieval England, jury of the county. . . . While Article III provided for venue, it did not impose the explicit juror-residence requirement associated with the concept of 'vicinage.' See *Maryland* v. *Brown,* 295 F.Supp. 63, 80 (1969)." (*Williams* v. *Florida, supra,* 399 U.S. at p. 93, fn. 35 [26 L.Ed.2d at p. 456].)

Madison: 'are . . . inflexible in opposing a definition of the *locality* of Juries. The vicinage they contend is either too vague or too strict a term; too vague if depending on limits to be fixed by the pleasure of the law, too strict if limited to the county . . . .' The version that finally emerged from the Committee was the version that ultimately became the Sixth Amendment . . . . Gone were the provisions spelling out such common-law features of the jury as 'unanimity,' or 'the accustomed requisites.' And the 'vicinage' requirement itself had been replaced by wording that reflected a compromise between broad and narrow definitions of that term, and that left Congress the power to determine the actual size of the 'vicinage' by its creation of judicial districts. [Fn. omitted.]" (*Williams* v. *Florida, supra,* 399 U.S. at pp. 93-96 [26 L.Ed.2d at pp. 456-458].)

It thus seems abundantly clear that the "vicinage" requirement as stated in the Sixth Amendment, namely trial by a jury of the district wherein the crime shall have been committed, is an essential feature of jury trial preserved though changed by the Sixth Amendment and made binding upon the states by the Fourteenth Amendment. As stated earlier in this opinion, *Peters* and *Williams* explain that another essential feature of jury trial is that the jury consist of a representative cross-section of the community. Therefore, a criminal defendant in a state criminal prosecution has a constitutional right to be tried by a jury drawn from, and comprising a representative cross-section of, the residents of the district wherein the crime shall have been committed.

In the case at bench, defendant's position is essentially this: Since his alleged crimes occurred in the Central District and since he was tried by a jury from which residents of that district had been systematically excluded, he was denied his constitutional right to a trial by a jury representing a cross-section of the district where the crime had been committed. The People's position on the other hand is this: Since "district" as used in the Sixth Amendment means county and all the jurors were drawn from Los Angeles County, defendant was not deprived of any constitutional right to a trial by a jury drawn from the cross-section of the community. Defendant concedes that, a jury drawn from the whole county would satisfy the "vicinage" requirement and that a jury drawn from only a portion of the county, provided the crime was committed in that portion of the county, would also satisfy that requirement. He contends, however, that a jury drawn from only a portion of a county, which specifically excludes that portion of the county where the crime was committed, fails to satisfy the "vicinage" requirement of a jury of the district where the crime was committed.

Defendant in support of his position relies upon *Alvarado* v. *State* (Alaska 1971) 486 P.2d 891 and *State of Maryland* v. *Brown* (D.Md. 1969) 295 F.Supp. 63. In *Alvarado* the defendant was charged with committing a crime in the native village of Chignick, Alaska, but was tried and convicted in Anchorage, Alaska. The jury panel for criminal trials was drawn from an area within a 15-mile radius of Anchorage. Since Chignick, the scene of the crime, was more than 15 miles from Anchorage, all jurors from the village where the crime was committed were excluded from the jury panel. The Alaska Supreme Court reversed the conviction because the defendant had been denied his constitutional right to an impartial jury, drawn from a source truly representative of a fair cross-section of the community where the crime was committed. "[T]he traditional starting point for determining the community from which jurors are to be selected is the scene of the alleged offense. [Fn. omitted.] Hence, we feel that in determining whether the source from which a given jury is selected represents a fair cross-section of the community, we must adhere to a notion of community which *at least encompasses the location of the alleged offense.* [Fn. omitted.] *It is the community in which the crime was committed that the jury must represent.* [¶] Because the focus of the concept of community is on the place where the offense has allegedly been committed, any narrowing of the area from which prospective jurors are drawn will have no effect on the impartiality of jury panels, so long as the narrow area of selection continues to include the scene of the crime, . . . *Where, on the other hand, prospective jurors are selected from an area which does not encompass the scene of the alleged crime, there will always be a danger that significant elements of the community in which the crime occurred will be excluded from representation on the jury panel, and that the panel will consequently fail to represent a fair cross-section of the community."* (Alvarado v. *State, supra,* 486 P.2d at pp. 902-903.) (Italics added.)

In *State of Maryland* v. *Brown, supra,* 295 F.Supp. 63, the defendant was charged by indictment with various offenses alleged to have been committed within Dorchester County. Over Brown's objection, the place of trial was changed from Dorchester County to Harford County on the motion of the prosecution made on the ground that it would be impossible to have a safe, fair, orderly trial in Dorchester County because of the public reaction to the crimes. Brown then sought to remove the case to the federal courts, claiming, inter alia, he "will also be denied his rights to a jury which fairly represents the community in which the alleged crime was supposed to have taken place, . . ." *(Id.* at p. 72.) His motion was denied on the ground that he had failed to meet the standard for removal, namely inability to enforce a racially oriented right in the state court.

Emphasizing the distinction between venue, i.e., a trial in a particular place, and vicinage, i.e., a jury drawn from a particular locality,[2] the court held that the change of venue under state law from the county where the crime was committed to another county of the state violated none of Brown's constitutional rights. Nevertheless, the court declared that if the Harford County jury were drawn from a panel which excluded jurors residing in Dorchester County, the scene of the alleged crime, Brown's constitutional right to a jury of the district where the crime was committed would be violated. Observing that in such event Brown's remedy would be to insist that Dorchester County residents be included in the jury panel or comprise the whole jury panel, the court went on to say: "[T]here would appear to be nothing in the federal Constitution to prevent a state from trying any criminal case anywhere within the state, with a state-wide jury or with a jury selected from residents of the jurisdiction in which the alleged offenses were committed. While there may be due process, equal protection, or other constitutional limitations on the power of a state governmental system arbitrarily to *exclude* from a jury panel residents of the jurisdiction in which the crimes have allegedly been committed, a defendant would seem to have no right to be tried by a jury which is selected from a population base which includes such residents if a fair and impartial jury cannot thereby be provided or if there are other sufficiently compelling reasons for excluding from the jury residents of that jurisdiction." (295 F.Supp. at p. 83; original italics.)

We may distill from *Alvarado* and *Brown* the following principle: Although a jury drawn either from an entire county wherein the crime was committed or from that portion of a county wherein the crime was committed will satisfy the constitutional requirement of "an impartial jury of the State and district wherein the crime shall have been committed" (U.S. Const., 6th Amend.) a jury drawn from only a portion of a county, exclusive of the place of the commission of the crime, will not satisfy the requirement.

We find the reasoning of *Alvarado* and *Brown* persuasive. The People would distinguish *Alvarado* on the ground that Alaska is unique—that the vast cultural, sociological and ethnic differences between the village of Chignick and the City of Anchorage were necessary to the decision and that similar differences simply do not occur between the Southwest and

---

[2]"Only in the Judiciary Article does the Constitution purport to restrict the *venue* of criminal cases. The Sixth Amendment's provision here under discussion pertains only to the locality from which the jury is to be selected; in other words. it defines the outer limits of the *vicinage* from which the jury must be summoned." (Heller, The Sixth Amendment (1951) pp. 92-93.)

Central Districts of Los Angeles County. Contrary to such claim, it appears to us that the great cultural differences between Chignick and Anchorage are merely dramatically illustrative of one of the purposes of the constitutional rule and do not represent an indispensable factor in its application. In our view, the rule quite simply is that a criminal defendant is entitled to a jury drawn from a jury panel which includes jurors residing in the geographic area where the alleged crime occurred.

It is undeniable that the Sixth Amendment did enlarge the total area from which the jury can be drawn over the area which obtained at common law and that the Sixth Amendment allows the Legislature to define the total size of that area by defining the size of the judicial districts.[3] The first federal judicial districts created by the Judiciary Act of 1789 were, with only two exceptions, statewide.[4] As a result, in the trial of crimes committed within a particular judicial district, the jury of that district could be drawn from a statewide panel. When subsequently in our history additional judicial districts, and finally divisions within such districts, were created, it was held that the jury could be drawn solely from the division within the district consistent with the Sixth Amendment juror-residence requirement. However, it is noteworthy that in all those cases the crime had apparently been committed within the division from which the jury was drawn.[5]

Thus, while the outer limits of the "district" as used in the Sixth Amendment are flexible, encompassing greater or smaller areas as the Legislature deems wise, the mandate of the Sixth Amendment remains immutable. The district, however large or small, from which the jury is drawn must include the area wherein the crime was committed. The *Alvarado* court, as well as the *Brown* court, stated and recognized this rule. The *Alvarado* court then went on to demonstrate the interrelationship between this feature of a trial by jury and another feature of such a trial equally applicable to the states, namely the "impartial" nature of the jury. Pointing out that the constitutional requirement of a trial "by an impartial jury" means a jury comprising

[3]*Williams* v. *Florida, supra,* 399 U.S. 78, 93-96 [26 L.Ed.2d 446, 456-458].

[4]Massachusetts and Virginia were each divided into two districts. (1 Stat. 73 (1789).)

[5]In *United States* v. *Wan Lee* (N.D.Wash. 1890) 44 F. 707 the court held that a jury can constitutionally be drawn from a division within a judicial district and need not be drawn from the whole judicial district, provided: "The court can only bring to trial at any term persons accused of committing offenses within the division; and the jurors, grand and petit, should, to accomplish the purpose of this act, be *summoned only from that part of the district."* (*Id.* at p. 708; italics added.) (See *Ruthenberg* v. *United States* (1917) 245 U.S. 480, 482 [62 L.Ed. 414, 418, 38 S.Ct. 168]; *United States* v. *Titus* (2d Cir. 1954) 210 F.2d 210, 212-213; *United States* v. *Ayres* (D.S.D. 1891) 46 F. 651.)

a representative cross-section of the community, the court emphasized that such community meant that in which the crime had been committed.

In the case before us the judicial district where the crime occurred—the Central District—had a population that was 31 percent Negro; the judicial district from which the jury was drawn—the Southwest District—had a population that was 7 percent Negro. This represents a serious difference. However, even if the two judicial districts had contained an identical proportion of Negroes, defendant would still be entitled to a jury drawn from a panel including residents of the judicial district where the crime was committed.

The People argue that even the *Brown* court recognized that there may be sufficiently compelling reasons to justify the exclusion of the residents of the place where the crime was committed[6] and that the inconvenience and cost to the court system and to prospective jurors resulting from the transportation of residents from the 77th Street Precinct to court in the Southwest District constituted sufficient reason to justify the procedures followed in the instant case.

We are not impressed by the argument. In the first place, we do not think that the *Brown* case can be read as holding inconvenience and cost to be compelling reasons in view of its following language: "The miles and hours separating the county seats of Dorchester and Harford counties hardly present insurmountable or even highly inconvenient barriers." (*State of Maryland* v. *Brown, supra,* 295 F.Supp. at p. 82.) In the second place, there would not appear to be any substantial inconvenience and cost in the instant case since for years prior to 1969 the residents in the 77th Street Precinct served on juries in the Southwest District. In 1969 when the 77th Street Precinct was placed in the Central District and its residents were called for jury service in that district, the 77th Street Precinct was of course not physically changed but merely moved on a map. It is inconceivable to us that drawing lines on a map somehow made the journey to jury duty in the Southwest District highly inconvenient and costly. Finally, if inconvenience and cost were deemed sufficient to justify the exclusion from the jury panel of residents in the district where the crime was committed, the People could defeat this constitutional right by merely changing venue. We do not say that there may not be an exceptional case where inconvenience and cost

---

[6]The People refer to the following excerpt from *Brown:* ". . . a defendant would seem to have no right to be tried by a jury which is selected from a population base which includes such residents if a fair and impartial jury cannot thereby be provided or if there are other sufficiently compelling reasons for excluding from the jury residents of that jurisdiction." (*State of Maryland* v. *Brown, supra,* 295 F.Supp. at p. 83.)

could constitute sufficiently compelling reasons; we are satisfied that this is certainly not such a case.

■ To recapitulate, we hold that the Sixth and Fourteenth Amendments to the United States Constitution as interpreted in *Williams* and *Peters,* guarantee a criminal defendant in a state trial the right to be tried by an impartial jury comprising a representative cross-section of, and selected from residents of, the judicial district where the crime was committed. ■ Since the alleged crime in the instant case occurred within the 77th Street Precinct in the Central District and since the jury was drawn from a panel which excluded all residents from the Central District, including those residing in the 77th Street Precinct, the juror-residence requirement contained in the Sixth Amendment and made applicable to the states through the Fourteenth Amendment was violated.[7]

For the guidance of the court upon retrial, it is necessary to examine defendant's final contention, namely that it was error to give CALJIC instruction No. 4.71[8] when the prosecution's evidence pointed to the offense occurring at a particular time and when defendant presented an alibi for the time shown by the evidence of the prosecution.

Officer Moore testified that he purchased marijuana from defendant upon three occasions, February 17, March 10 and March 24, 1970. Officer Moore first testified that the final purchase occurred on March 17, but then

---

[7]Penal Code section 1060 requires that all challenges to the jury panel be made "before a juror is sworn." It is well settled that challenges, including constitutional challenges, to the jury panel must be taken within the time prescribed by section 1060 and cannot be raised for the first time on appeal. (*People* v. *Sirhan* (1972) 7 Cal.3d 710, 751-752 [102 Cal.Rptr. 385, 497 P.2d 1121]; *People* v. *Gardner* (1969) 71 Cal. 2d 843, 854-855 [79 Cal.Rptr. 743, 457 P.2d 575]; *People* v. *Schader* (1969) 71 Cal.2d 761, 784 [80 Cal.Rptr. 1, 457 P.2d 841]; *People* v. *Neal* (1969) 271 Cal.App. 2d 826, 836-837 [77 Cal.Rptr. 65]; *People* v. *Sparks* (1967) 257 Cal.App.2d 306, 310-311 [64 Cal.Rptr. 682].) It is equally well settled that where the claimed errors could have been but were not raised upon appeal, such errors cannot be raised by writ of habeas corpus, absent special circumstances. (*In re Shipp* (1965) 62 Cal.2d 547, 552 [43 Cal.Rptr. 3, 399 P.2d 571]; *In re Dixon* (1953) 41 Cal.2d 756, 759 [264 P.2d 513]; see *People* v. *Wilson* (1963) 60 Cal.2d 139, 146 [32 Cal.Rptr. 44, 383 P.2d 452] and *In re Anderson* (1955) 134 Cal.App.2d 552, 553 [285 P.2d 690], holding that failure to object to the lack of speedy trial in the trial court barred raising the point for the first time either on appeal or by habeas corpus.) Therefore, only those defendants who have made an appropriate timely challenge to the jury panel in the trial court and reiterated the challenge upon appeal may avail themselves of the ruling in the instant case.

[8]CALJIC No. 4.71 provides: "When, as in this case, it is alleged that the crime charged was committed 'on or about' a certain date, if the jury finds that the crime was committed it is not necessary that the proof show that it was committed on that precise date; it is sufficient if the proof shows that the crime was committed on or about that date.

after reviewing his notes testified that March 24, 1970, was the correct date. Upon cross-examination, Officer Moore emphasized that March 24, 1970, was the date of the final purchase. The majority of the defense evidence went to establish that defendant was in Texas on March 24, 1970.

The comment to CALJIC No. 4.71 states in pertinent part: "This instruction is improper if the People's evidence fixes the commission of the offense at a particular time to the exclusion of any other time and the defendant has presented evidence of an alibi as to that particular time. . . ." This comment accurately recognizes the rule as developed by the courts. In *People* v. *Morris* (1906) 3 Cal.App. 1 [84 P. 463] the prosecutrix in a rape case fixed the act of rape at 4 o'clock in the afternoon of a particular day. The defendant offered an alibi for that time. The court held it was error not to instruct the jury to confine their consideration to the time that the prosecution evidence showed the offense had been committed. In *People* v. *Waits* (1936) 18 Cal.App.2d 20 [62 P.2d 1054] the prosecution evidence fixed the crimes as occurring on April 7, 1936. Defendant offered an alibi for that day. The court held: "In light of appellant's alibi defense, the time the alleged offenses were committed became material, and it was the duty of the trial court to limit the jury in its consideration of the evidence to the period which the prosecution selected as the time of the commission of the offenses. (*People* v. *Morris,* 3 Cal.App. 1, 10 [84 Pac. 463].) It was, therefore, prejudicially erroneous for the trial court to instruct the jury . . . that it was wholly immaterial on what day the offenses were committed." (*Id.* at p. 21.) *People* v. *Brown* (1960) 186 Cal.App.2d Supp. 889 [9 Cal.Rptr. 53] is in accord. This court in *People* v. *Wrigley* (1968) 69 Cal.2d 149, 154-157 [70 Cal.Rptr. 116, 443 P.2d 580] specifically affirmed these cases and recognized this rule.

Thus, since Officer Moore testified that the final purchase from defendant had been made on March 24, 1970, and since defendant offered evidence establishing an alibi, namely that he had been in Texas on that date, it was error to give CALJIC instruction No. 4.71. The People seem to recognize that the giving of this instruction was error but argue that defendant waived his right to object by cross-examining Officer Moore as to the accuracy of his recollection of the date in question. Defendant contended that he had gone to Texas on March 20, 1970, and was still there on March 24. Since Officer Moore initially testified that the final purchase occurred on March 17, it was crucial to the defense to establish and emphasize the March 24th date as the defense had an alibi for that date. Establishing and emphasizing that date by cross-examination could hardly be construed as waiving the

right to an alibi on that specific date. The trial court should be guided accordingly in the event of retrial.

The judgment is reversed.

Wright, C. J., Tobriner, J., and Mosk, J., concurred.

**BURKE, J.**—I dissent. The majority opinion reverses appellant's conviction on the ground that he was denied his right to a trial by a "jury of the State *and district* wherein the crime shall have been committed" (italics added) as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. For the reasons set forth below, I have concluded that the jury selection procedure employed in this case does not violate the Sixth Amendment's so-called "vicinage" requirement.

## I. *Vicinage*

Although the concept of "vicinage" (see *ante,* p. 550, fn. 1) was embodied in the Sixth Amendment, it is evident that Congress did not intend the Sixth Amendment's "vicinage" provision to connote the identical meaning the term had come to acquire in England.[1] The issue in this action is whether this provision of the Sixth Amendment, made binding on the states by the Fourteenth Amendment, mandates the inclusion of Los Angeles Central District residents in appellant's jury panel. Although the majority answer this inquiry affirmatively, I reach the contrary conclusion.

As used in the Sixth Amendment, the term "district" refers to the judicial districts created by the Judiciary Act of 1789[2] and not to the subdivisions of a single county, as here, the administrative branch court districts of the Los Angeles County Superior Court. The Sixth Amendment includes the provision that the district from which the jury is to be chosen "shall have been previously ascertained by law." A reasonable interpretation of this clause leads to the conclusion that the framers of the Sixth Amendment intended to refer to the *federal* judicial districts, such as the present Northern District of California, since the Judiciary Act of 1789 was passed on the day preceding the recommendation of the constitutional amendment

---

[1]See Heller, The Sixth Amendment (1951) pages 92-97; Blume, *The Place of Trial of Criminal Cases: Constitutional Vicinage & Venue* (1944) 43 Mich.L.Rev., pages 59, 60-67.

[2]Section 2 of the Judiciary Act (1 Stat. 73 (1789)) reads in part: "[T]he United States shall be, and they hereby are, divided into thirteen districts, . . . ." Each of the original eleven states was designated a single district except for Massachusetts and Virginia, which were each divided into two districts.

to the states.[3] Thus, I see no basis whatever for assuming that the term "district" could refer to the administrative branch court districts in Los Angeles County.

Even assuming arguendo that "district" was intended to refer not only to a federal judicial district but to the county in which the offense was committed, it still follows that since appellant's jury panel was drawn from within Los Angeles County, the procedure employed to select his jury panel complied with the "vicinage" requirement of the Sixth Amendment. Rather than narrowly restricting the area from which a jury may be selected, the Sixth Amendment marked the extreme bounds of this area.[4] The fact that appellant's jury panel was drawn from only a portion of the county, which did not include residents of the central district wherein the offense was committed, is insufficient to render the conviction invalid.

*United States* v. *Florence* (4th Cir. 1972) 456 F.2d 46, supports this position. In *Florence,* a draft evasion case, defendant was ordered to report for induction at Parkersburg, West Virginia, one of the six cities designated for holding court in the Northern District of West Virginia. Prospective jurors from Wood County, defendant's county of residence, were included only in the jury panels for trials held at the Parkersburg "division" of the Northern District of West Virginia. However, defendant was indicted, tried, and convicted in Elkins, West Virginia. Since the residents of Wood County served only on Parkersburg juries, the grand and petit juries of the Elkins "division" which indicted and convicted defendant excluded residents of both defendant's home county and the Parkersburg "division."

The Fourth Circuit affirmed the conviction, holding that "[W]e conclude that Florence had neither a constitutional nor statutory right to a district-wide jury nor to a jury selected from the Parkersburg 'division.' " (*United States* v. *Florence, supra,* 456 F.2d 46, 50.) That decision was premised upon the Jury Selection and Service Act of 1968[5] which requires the selection of jurors to be made from the counties or political subdivisions surrounding the place of trial.

Although the *Florence* court did not explicitly mention the Sixth Amendment, its implied conclusion was that there is no right to the inclusion on the jury panel of residents from either the defendant's home county or the "division" wherein the crime was committed. The similarities between the

[3] Heller, *supra,* page 94.
[4] Heller, *supra,* pages 92-93, 97.
[5] 28 United States Code section 1861 et seq.

situation in *Florence* and in the case under review are striking. Here, the offense occurred in the 77th Street Precinct, but trial was had in the Southwest District which excluded 77th Street Precinct and other Central District residents from the jury panel. In *Florence* the trial was held in the Elkins "division" and the jury panel excluded all residents of the counties within the Parkersburg "division." Thus, since the procedure employed in Florence comported with statutory and constitutional requirements, so does the procedure involved in this case. I fail to perceive the reasons which underlie the contrary conclusion of the majority.

The Supreme Court of Iowa, when presented with a similar issue affirmed the constitutionality of a local jury selection statute in *State* v. *Kappos* (Iowa 1971) 189 N.W.2d 563, appeal dismissed, 405 U.S. 982 [31 L.Ed.2d 449, 92 S.Ct. 1246]. Following a jury trial in a municipal court located in the City of Ames, defendant was convicted of knowingly permitting a minor to purchase or consume alcoholic beverages on the premises of a licensed liquor establishment. On appeal defendant contended, inter alia, that Iowa Code section 602.34[6] was unconstitutional. Defendant's tavern, the site of the offense, was located in Cambridge, a small town in Story County, which is within the territorial jurisdiction of the municipal court where the trial was had.[7] Thus, by operation of statute defendant was tried by a jury composed entirely of the residents of Ames and which excluded residents from other portions of the territorial jurisdiction of the municipal court.

In upholding the constitutionality of the challenged statute, the court rejected the contention that defendant had been denied due process and equal protection of law under the state and federal Constitutions. Although the concept of "vicinage" was not discussed, the court remarked "We hold the selection of jurors as provided in section 602.34 did not violate defendant's constitutional rights nor deprive him of an impartial jury." (*State* v. *Kappos, supra,* 189 N.W.2d 563, 564.) It appears that the primary focus in *Kappos* was on the impartiality of the jury rather than "vici-

---

[6]Iowa Code section 602.34 reads in pertinent part: "Jury list. The commission, in the presence and under the supervision of the judge of said court . . . shall, on the establishment of the court, prepare from the pollbooks of the last preceding general election in the territory included in the *municipal court district,* a list equal in number to one-tenth of all electors thereon qualified for jury service, which shall be known as the 'jury list,' . . ." (Italics added.)

Iowa Code section 602.1 defines a municipal court district: "A municipal court may be established in any city having a population of five thousand or more, by proceeding as hereinafter provided. All that part of each civil township within the corporate limits of such city shall constitute the municipal court district."

[7]Iowa Code section 602.16 reads in part "The jurisdiction of the municipal court shall be coextensive with the territorial limits of the county. . . ."

nage." Yet, by sustaining the validity of the challenged provision the Supreme Court of Iowa impliedly concluded that the jury panel need not include residents of the portion of the district wherein the crime was committed. In view of the majority's extensive references to impartiality in conjunction with the discussion of "vicinage," I consider it necessary to comment next upon that particular point.

## II. *Impartiality*

Having explained why appellant was not denied his constitutional right to a jury trial in the "district" wherein the crime was committed (i.e., vicinage), I turn to the related question whether appellant was denied the further right to a jury "representative of a cross section of the community"[8] (i.e., impartiality).

The majority's holding appears to be based upon a synergistic combination of these two foregoing principles, and an interchangeable use of the terms "district" and "community." Thus, the majority conclude "Therefore, a criminal defendant in a state criminal prosecution has a constitutional right to be tried by a jury drawn from, and comprising a representative cross-section of, the residents of the district wherein the crime shall have been committed." (*Ante,* p. 551.) Yet, just as the term "district" under the Sixth Amendment has no relation whatever to a particular administrative "district" in Los Angeles County, likewise the term "community," as used in cases discussing the issue of impartiality, is neither the geographical equivalent of, nor the lexical synonym of, a local, inter-county district such as the Central District of Los Angeles.

The inferential and unwritten conclusion derived from the majority holding is that the exclusion of 77th Street Precinct residents somehow denied appellant a jury which reflected a representative cross-section of his "community." Without attempting to define the metes and bounds of the elusive concept of "community," I submit that the appellant's jury panel did not exclude any "significant element" or "discernible class," and consequently was not unreflective of a representative cross-section of the "community." Two recent decisions support this conclusion.

In *United States* v. *Butera* (1st Cir. 1970) 420 F.2d 564, after conviction for attempted income tax evasion, defendant appealed the denial of his motion to dismiss the indictment on the ground that it was returned by an unlawfully constituted grand jury. The court agreed that the jury lacked three cognizable and distinct groups (see *Hernandez* v. *Texas,* 347 U.S.

---

[8]See *Peters* v. *Kiff* (1972) 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163].

475, 478-480 [98 L.Ed. 866, 870-871, 74 S.Ct. 667]), namely, young adults, women, and the "less educated." In discussing the defendant's contention that geographical areas constituted an additional discernible group, the court remarked "[W]e are not aware that residents of counties can be said to hold views and attitudes which are in any way 'distinct' from those of their neighbors in nearby counties, nor has defendant given us any evidence of such distinctness. While common experience tells us that people's attitudes differ to some degree along lines of age, sex, and extent of education, we are not aware that they differ along county lines. We have been willing above to give a broad meaning to the requisite 'distinctness' of classes but in each instance we could point to some indication that the groups isolated by defendant—at least in a general sense—possessed the essential element of distinctness. [Fn. omitted.]" (*United States* v. *Butera, supra,* 420 F.2d 564, 572.)

Recently, in *People* v. *McDowell,* 27 Cal.App.3d 864 [104 Cal.Rptr. 181], defendant challenged the procedure employed to select jury panels in San Bernardino County which automatically excluded individuals residing more than 25 miles from the courthouse. The court, in affirming the jury selection process, stated (p. 875), "While experience tells us attitudes may differ along lines of education, sex, age, race and social and economic class, we are not aware they normally differ along lines respecting place of residence within a county. Although the geographical limitation might have some significance if it divided the county into rural and urban districts, appellant has offered no statistics showing those excluded might think or react differently from those included on matters which might be submitted to them as jurors."

On the basis of the *Butera* and *McDowell* decisions, I have concluded that the absence of 77th Street Precinct residents from the appellant's jury panel cannot be said to have amounted to an exclusion of any "significant element" or "discernible group" and that the jury accordingly reflected a cross-section of the community. The discussion in the aforementioned cases relating to lack of differences in or between counties is equally applicable to the branch court districts of the superior court within Los Angeles County. Appellant has made no affirmative showing of any significant feature sufficient to differentiate the 77th Street Precinct from any other area within Los Angeles County.

Additionally, examination of the cases relied upon by the majority demonstrates little support for the proposition that appellant was deprived of his constitutional rights. *State of Maryland* v. *Brown* (D.Md. 1969) 295 F.Supp. 63, treated the issue whether defendant was entitled to remove his

case to federal court under applicable provisions of the United States Code. The portion of that decision quoted by the majority was largely dictum and unnecessary for a proper resolution of that controversy. Since lower federal court decisions are not binding upon this court, I would accord the gratuitous language in the *Brown* decision little weight in the determination of the present controversy. (See *People* v. *Bradley,* 1 Cal.3d 80, 86 [81 Cal. Rptr. 457, 460 P.2d 129]; *People* v. *Clark,* 2 Cal.App.3d 510, 519-520 [82 Cal.Rptr. 682].)

The principles to be drawn from *Alvarado* v. *State* (Alaska 1971) 486 P.2d 891, warrant further analysis in light of the majority's reliance upon that decision. The Supreme Court of Alaska was primarily concerned with securing an impartial jury which reflected a cross-section of the community rather than with the "vicinage" requirement of the Sixth Amendment.[9]

The portions of *Alvarado* quoted by the majority appear to support, at least initially, the blanket proposition that selection of jurors must in every situation include the area surrounding the scene of the crime. However, footnote 29, page 902, which limits the language cited by the majority, reads "This does not mean that the source of prospective jurors must in all instances include residents of the place in which the crime was allegedly committed, for it is conceivable that the source of prospective jurors may exclude the scene of the alleged offense, yet . . . reasonably represent a cross section of the community which includes the scene of the offense. Thus, several decisions imply that selection of prospective jurors from a restricted area within a judicial district, even if the scene of the crime is omitted from that area, will be acceptable if there is no indication that the population of the restricted area differs significantly from the population of the entire district. [Citations.]"[10]

---

[9]This conclusion is supported by the following language: "The narrow issue with which we are presented in this case, then, is whether . . . Alvarado's jury panel was drawn from a fair cross section of the community." (P. 898.)

Later the court concluded: "As we have already noted, under certain circumstances it may be permissible to exclude the area of the crime from the source of jury selection [fn. omitted]. . . . Our ultimate objective is only that juries be selected at random from a source which reflects a fair cross section of the community in which the crime has allegedly occurred; if this goal is attained, the accused will truly have been judged by a jury of his peers. [Fn. omitted.] What we do hold, then, is that an individual should not be forced, against his will, to stand trial before a jury which has been selected in such a manner as to exclude a *significant element* of the population of the community in which the crime was allegedly committed." (Italics added; pp. 904-905.)

[10]This footnote appears in the text of *Alvarado* cited on page 552 of the majority opinion where it is noted that a footnote is omitted between portions of the italicized language.

In *Alvarado,* of course, the officials faced unique circumstances in the process of selecting prospective jurors in Alaska. Although the majority find "that the great cultural differences between Chignick and Anchorage are merely dramatically illustrative of one of the purposes of the constitutional rule and do not represent an indispensable factor in its application," I am compelled to conclude otherwise. The circumstances presented in *Alvarado* are unlike any other conceivable situation in the United States; *Alvarado* can be more appropriately likened to the trial of an aboriginal tribesman in an urban Australian metropolis for an offense allegedly committed in the wilds of the bush country. That the differences between the village of Chignick and the City of Anchorage were foremost in the minds of the justices of the Supreme Court of Alaska is evidenced by their detailed and lengthy discussion of this point.[11] Thus, although it cannot be said that the same factors which distinguish life in Chignick from life in Anchorage should be the parameters by which we determine the differences, if any, between the 77th Street Precinct and the Southwest District, the appellant has failed to demonstrate the existence of any significant differing characteristics which warrant our wholesale adoption of *Alvarado.*

I believe the majority's decision could significantly impede the administration of criminal justice in Los Angeles County. The presiding judge of the superior court is empowered to allocate and when necessary to shift the trials of cases to any branch court districts in order to alleviate congested court calendars and to guarantee the right to a speedy trial.[12]

---

[11]See *Alvarado* v. *State, supra,* 486 P.2d 891, 899-901. Characteristic of this discussion are the following excerpts: "The evidence in the record, summarized above, convincingly reveals the unique situation which prevails in the third judicial district [out of which *Alvarado* arose] and, indeed, throughout the State of Alaska. This evidence vividly portrays the enormous gulf which separates the mode of life of the typical Alaskan villager from the type of existence led by most residents of Anchorage and other cities of the state. The differences between a Native village and the City of Anchorage are neither simple nor superficial; they are not restricted to a single element such as occupation or income. [Fn. omitted.] Rather, the lines of separation are profound and intersect areas including occupation, economy, domestic relations, politics, language, religion, race, cultural heritage, and geography." (P. 899.)

The court also stated (p. 900) that "The gap stretching between these two distinct classes of community is of far greater magnitude than that which normally separates city from city or small town from city elsewhere in the United States. *We are faced here with the order of differences which distinguishes one culture from another."* (Italics added.)

[12]Rule 2, section 5, of the Rules of Superior Court of Los Angeles County provides: "Whenever, in the opinion of the Presiding Judge, the calendar in any district including the Central District, has become so congested as to jeopardize the right of a party to a speedy trial or to materially interfere with the proper handling of the judicial business in the district, he may order the transfer of one or more cases pending in that district to another district for trial or may order, for a limited period, that cases which may be filed in that district shall be filed in a different district."

However, in light of the majority opinion and Code of Civil Procedure section 206,[13] the aforementioned powers of the presiding judge will be severely restricted. The burdensome workload of the courts is presently overwhelming, and in the absence of any constitutional imperative, I fail to perceive any justifiable reasons for adding this additional restriction upon the orderly administration of justice.[14]

Accordingly, I would affirm the judgment of conviction.

McComb, J., and Wood, J.,* concurred.

[13]Code of Civil Procedure section 206 reads in pertinent part: ". . . In a county of the first class [Los Angeles County], where sessions of the superior court are held in cities other than the county seat, the names for such list to serve in the city shall all be selected from the district in which the city is located and no names from such district shall be selected to serve as trial jurors for any other part of the county, other than in the county seat."

[14]Although a jury of the "vicinage" is guaranteed by the Sixth Amendment and is binding on the states by reason of the Fourteenth Amendment, today's strict construction by the majority appears to serve no useful purpose in the administration of justice. One author has noted that "essentially we remain faced with the fact that vicinage is an anachronism unsuited to modern conditions and productive of neither better justice nor greater liberty." He additionally remarked, "Vicinage, revitalized, as was suggested above, as a political argument of the Revolution, as a legal concept appears to be at cross purposes with the ideal of impartiality. The inclusion of both impartiality and vicinage in the same amendment is indicative of the transitory stage of criminal procedure at that time, but need not be taken as attaching equal weight and significance to the two requirements." (Heller, *supra,* p. 95.)

*Assigned by the Chairman of the Judicial Council.